Guy Dwight SAWYER d/b/a Sawyer's All Star Foods v. PIONEER LEASING CORPORATION

5-4501                    428 S. W. 2d 46

Opinion delivered May 27, 1968
[As amended upon denial of petition for rehearing]
September 3, 1968.

*McMillen, Teague, Bramhall & Davis,* for appellant.

*Rose, Meek, House, Barron, Nash & Williamson,* for appellee.

CARLETON HARRIS, Chief Justice. This case involves an ice machine. Appellant, Guy Dwight Sawyer, is an independent grocer, operating in Little Rock. Appellee, Pioneer Leasing Corporation, is a Delaware corporation, which instituted suit against Sawyer for the sum of $2,039.40, pursuant to a written instrument termed "Master Lease Contract." The instrument recites that the lessor is Pioneer Leasing Corporation and the lessee is Guy Dwight Sawyer d/b/a Sawyer's All Star Foods. The parties agreed that lessee was leasing a Linco Ice Station, and provided:

"This schedule is for a period of 60 months, at $45.32 per month beginning July 23, 1963. First and last 4 payments payable at time of signing this Schedule in the amount of $226.60."

Section 5 of the agreement recites:

"No warranties or representations regarding the items herein leased or their condition, quality or suitability, or their freedom from latent defects, have been made or shall be deemed to be made by the Lessor, and Lessee has selected the items leased and the same have

been delivered to Lessee at Lessee's sole risk and discretion.''

Section 8 states:

''At the expiration of the term of this lease for any item(s) leased hereunder, Lessee shall immediately redeliver such item(s) at Lessor's place of business or such other reasonable place as Lessor may designate within the State where the item(s) was leased, in like condition as it was received, less normal wear, tear and depreciation; properly crated with freight prepaid.''

Section 9, a rather lengthy section provides, *inter alia,* that in case of default in payment for a period of ten days, lessor is authorized to take immediate possession of the leased property, and lessee shall remain liable for the payment of the total rental, all such rental being immediately due and payable. Both pages of the instrument provide, ''This lease cannot be cancelled.''

The contract commenced on July 23, 1963, and appellant made his down payment, and several monthly payments, the last payment being made in May, 1964. Upon default, the suit was filed, and Sawyer, in his answer, asserted that the performance of the machine had been misrepresented at the time he entered into the contract, and that it was not suitable for the purpose for which he desired to use it, though represented to be suitable, and that there had been an implied warranty of fitness upon which he relied; that such warranty had been breached, since the machine had ceased to operate, and was incapable of being repaired. On trial, appellee moved for a directed verdict at the conclusion of the evidence, which motion was granted, the jury returning its verdict for appellee in the amount of $2,039.40. From the judgment so entered, appellant brings this appeal.

Sawyer testified that he had a number of customers who desired that he acquire an ice maker, in order that

they might obtain packaged ice. He made inquiry, and subsequently, a man named Don Barnett from Benton (evidently learning of Sawyer's inquiries) contacted him about a machine. Barnett showed appellant pictures of a Linco ice making machine, and advised that the machine would work either inside or outside of the building. They decided the best location would be the front porch. Sawyer further stated that Barnett told him that the machine would manufacture 400 pounds of ice per day, and appellant, in agreeing to take same, stated that he understood that he was purchasing the property. Subsequently, Barnett brought back the lease agreement, heretofore referred to, and when Sawyer inquired why he was being asked to sign a lease agreement, instead of a purchase agreement, was told, according to the witness, "Well, it was just like buying a car, after you pay so many payments, it is your box." Sawyer testified that he did not read the provisions of the contract in detail, and that he had only a sixth grade education.

Still further, according to the witness, the machine, after being installed, worked satisfactorily for about six months, in fact, until "the first cold spell came." It then ceased to function. Appellant called Barnett to get the name of the mechanic for the company, and was advised that the company did not have one, and that Sawyer should call any refrigeration company. Ralph Henderson, a refrigeration man, was contacted, and the witness related that Henderson worked for over a month on the machine, and was paid "around $100.00 for his work," but Henderson was unable to get the machine to produce more than fifty pounds of ice per day. Nothing further was done until spring, when a man named Byers was contacted; Byers, too, was unable to get the machine in any better working order, and only charged around $100.00 for his work, instead of the original intended charge of $150.00. After the unsuccessful efforts of Byers, appellant testified:

"Well, I called Mr. McCoy . . . well, I first call Mr. Barnett and in turn called Mr. McCoy, then I called Mr.

Carter from Memphis and I called a fellow from Warren, then I called the ice making company itself, down in Texas . . . tried to get all of them to do anything about the box, tried to get it to operate. * * * None of them would do anything."

Thereafter Sawyer quit making payments, and the suit followed.

C. H. Turner of Memphis, Treasurer of Pioneer Leasing Corporation, and in charge of all the records of the company, testified that Pioneer Leasing Corporation is in the equipment leasing business. He stated that his company buys equipment after it has been selected by the lessee, and he has signed lease agreements; that all items are delivered to a lessee at the latter's sole risk, and that the company only purchased the ice making machine because Sawyer had selected it. Turner testified that he had no idea what Sawyer was told at the time he signed the lease; that Barnett had never been an employee of appellee, but rather, was a sales agent for the supplier of the equipment; that the machine had been purchased from the Tri-State Ice Machine Company, and Sawyer had paid a total of $679.80. The company official said that the expected life of the machine was eight or ten years, and at the end of the five-year lease period, Pioneer "more than likely would have offered to sell it to Mr. Sawyer" for a price that would have to be negotiated. He stated that appellee had had no leases on ice machines that had expired.

John P. McCoy, who had been employed by Pioneer in 1964, 1965, and 1966, stated that prior to the transaction, he had never met Sawyer or Barnett; that he did not write up the agreement and did not know who did write it. The witness had directed a letter to Turner, relating that Sawyer was very unhappy with the machine, had spent money endeavoring to have it repaired, and had expressed the thought that Pioneer should "put the pressure on Tri-State to get the machine working.

He claims he is not going to make any more lease payments until the machine is fixed. I told him that maintenance was not our problem.'' McCoy had no idea what Barnett might have told Sawyer about his relationship with the company. These were all of the witnesses who testified.

Of course, the only question before this court is whether appellant offered sufficient evidence to warrant the submission of the case to the jury. There are no express warranties, and the appellant relies upon alleged misrepresentation by Barnett, and a breach of implied warranty. The testimony of Sawyer relative to Barnett's statements has heretofore been set out. Appellee's first answer to this argument is that Barnett was not an agent of Pioneer. The testimony of Turner (that Barnett was never an employee of Pioneer) is pointed out, as well as the fact that Sawyer never did testify that Barnett said he was an agent or employee of Pioneer. Nonetheless, it is undisputed that Barnett was the man who presented the contract to Sawyer, and obtained his signature thereto. In fact, it appears that all proceedings in connection with the execution of the lease by appellant were handled by Barnett—who did not testify. Certainly, the obtaining of the lease was called to the attention of appellee company, for the instrument was subsequently executed by the president of the company, Barclay McFadden—evidence that the contract was thus ratified. More than that, the company accepted payments from Sawyer of over $600.00. In *Mark* v. *Maberry,* 222 Ark. 357, 260 S. W. 2d 455, we held that when one accepts the fruit of another's agency in the sale of property, he cannot subsequently be heard to disclaim such agency. That case involved real estate, but the principle applies likewise to the sale of personal property. We think the testimony on the question of agency was certainly sufficient to make a jury question.

Appellee calls attention to the fact that the ''spec sheet'' describing the features of the Linco machine, and

prepared by the C. M. Lingle Company, maker of the machine, is stamped at the bottom as showing the distributor of this machine to be Arkansas Ice Making and Vending Equipment Company of Benton. However, we consider this only a circumstance to be presented for the jury's consideration in reaching its verdict.

This brings us to the question of the implied warranty. Sawyer stated that Barnett told him that the machine would make four hundred pounds of ice per day, and it would operate either on the inside or outside of a building. The literature which was shown to Sawyer states that the ice maker has a capacity of "up to 400 lbs." According to appellant's evidence, representations as to the ice making capacity were not limited to the function of the machine during warm months; in fact, the literature shown Sawyer points out "bonus features," one of which reflects the machine to be "winterized." What this may mean is not entirely clear, but it would appear that it could well mean that the ice maker will operate efficiently in the winter, as well as in the summer. Whether Sawyer was entitled to rely upon this representation is simply another matter for the jury to pass upon.

It is also pointed out that the machine worked well for the first several months, and that, even if Barnett was an agent of Pioneer, and made the representations testified to by Sawyer, such representations (that the machine would operate outside), in order to afford appellant relief, must have been false at the time Sawyer claims to have relied upon them; since the machine did operate, as represented, for six months, there could be no misrepresentation of this fact. As a matter of law, we cannot say that we agree. After all, six months is about one-tenth of the total period to be covered by the lease, a lease that was non-cancellable. Could it be said that, if one purchases a new automobile which operates entirely satisfactorily for a few months, any implied warranty that the vehicle was suitable for the purpose

for which it was bought has been fully complied with even though it practically falls apart thereafter?

It is likewise argued that appellant employed mechanics to work on the machine, and continued payments for about ten months, and (says appellee) this confirms that Sawyer understood that there were no warranties, and that maintenance was solely his obligation. Of course, the record also reflects that Sawyer contacted Barnett and McCoy relative to the malfunction of the machine, but again, we simply point out that these were circumstances to be considered by a jury when determining the controversy, *i. e.,* these acts by appellant over the period of time involved, do not, *as a matter of law,* bar him from obtaining relief.[A]

Ark. Stat. Ann. § 85-2-316 (2) (Add. 1961), a part of the Uniform Commercial Code, provides:

"Subject to subsection (3) [which does not here seem applicable], to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and *in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.* [Our emphasis.] Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' "

In the contract before us, this provision has not been complied with. In fact, the entire agreement itself, including Section 5, heretofore quoted, is in very small print.

Of course, appellant contends the transaction is governed by the code, but the code is generally thought of as applying only to sales. Appellee points out that the contract under discussion was not a sale, since the lease does not provide for the passing of title. We agree with

See[A] page 962 for paragraph inserted here by amendment September 3, 1968.

that contention. Item 8, previously set out, describes what shall be done with the property at the end of the sixty months.

It is entirely possible, in fact, probable, as testified to by Turner, that Pioneer would have sold the machine to Sawyer if a price could be agreed upon, and the transaction is very close to being a sale. Still, the lease agreement definitely sets out that appellant shall, at the expiration of the term of the lease, immediately redeliver the leased property to lessor. It would thus be difficult to say that the instrument is not a lease—but we have reached the conclusion that it is subject to the pertinent provisions of the code, more specifically, the quoted subsection of Section 85-2-316. In reaching this conclusion, we are impressed with the reasoning of several authorities in this field. E. Allen Farnsworth, Associate Professor of Law at the Columbia University Law School, in an article, "Implied Warranties of Quality in Non-Sales Cases," 57 Colum. L. Rev. 653 (1957), states:

"To say that a warranty is implied in a sale is not to say that none is implied if there is no sale. Implied warranties of the quality of goods are today firmly entrenched in sales law and their growth has been paralleled by that of similar warranties where goods have been supplied under conditions not amounting to a sale. Yet so little attention has been directed to the latter that it is not unusual to find the assertion of an implied warranty rejected with the explanation that since the transaction was not technically a sale, no warranty could be implied. Conscious of this, the draftsmen of the Uniform Commercial Code state in a comment:

" 'Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as a part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales

contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire, whether such bailment is itself the main contract or is merely a supplying of containers under a contract for the sale of their contents.'

The writer then compares other uniform acts (Uniform Sales Act and Negotiable Instruments Law), pointing out that, though the sales act does not expressly provide for the implication of warranties in non-sales cases, it has influenced cases involving the non-sale of goods; further, that the Negotiable Instruments Law has, at times, been used as a source of rules to govern non-negotiable bills and notes.

Continuing, the writer says:

"A bailment for hire differs from a sale in that, while a sale transfers ownership in exchange for the price, a bailment for hire merely transfers possession in exchange for the rental and contemplates the return of the chattel to the owner. Yet it is very like a sale in regard to the reliance upon the supplier of the goods, and it is not surprising that a warranty of fitness for the intended use has been implied in a variety of such cases.[1] * * *

"The obligation is in many respects similar to that of the seller of goods. For example, there is no warranty where the bailment is gratuitous, nor does the duty extend to those not in privity with the bailor, and if the bailee has inspected the chattel, there is no warranty as to defects which the inspection should have revealed. The warranty is commonly described as though analogous to that of fitness for a particular purpose under the Uniform Sales Act, rather than that of merchantability."

---

[1] These were not cases under the code.

Still further, it is added:

"It has been suggested that just as the mass production of goods gave momentum to the growth of the modern law of the seller's obligations for the quality of those goods, so too the mass production of housing can be expected to create new obligations of sellers for the quality of that housing. Even more certainly, the boom in enterprises which thrive on the rental of everything from automobiles and floor waxers to linens and diapers portends an increase in the obligations of entrepreneurs now operating largely under rules formulated during the time of the horse and carriage.

\* \* \*

"The preceding discussion indicates that there is respectable authority for the extension of implied warranties to non-sales cases, in spite of a tendency to overlook the possibility. In borderline cases reasoning by analogy to sales law should not be merely a technique of last resort to be used only where the facts will not support the finding of a sale. It is preferable to categorization of the contract as one of sale and direct application of the sales statute."

In Hart and Willier, Forms and Procedures Under the Uniform Commercial Code (1966), a similar view is expressed.[2] The authors state in Paragraph 12.02, Subsection 1, Page 1-64:

"The warranty question is an example of application of Code provisions by analogy. While rented goods are not 'sold,' a property interest short of 'title' is transferred as in a sale and the transaction is in the nature of a bargain. Thus, express warranties, promissory or affirmatory in nature, could as well be a basis of the bargain under Section 2-313 as in a sale, and implied warranties, collateral to the transfer aspect, could logically accompany the transaction. More specifically, the lessor

[2]Willier and Hart are professors of law at Boston College Law School.

may expressly affirm that a machine to be leased will be of a certain model or capacity or the lessee may rely upon the lessor's skill and judgment in supplying goods suitable for a particular purpose to the lessor [sec. 2-315]. How much simpler and more certain it is for courts, counsel and parties if they can apply the rules of Article 2 by analogy to determine their obligations and their remedies. Still, courts at the trial level have shown a reluctance to do this. One court, however, *has* done so with reference to the sale of securities, expressly excluded from the definition of 'goods' in Section 2-105, insofar as Article 8 contained no rules relevant to the particular conduct in dispute. Both the leasing-of-goods and sale-of-securities examples involve commercial transactions and the Code encompasses commercial transactions.''

It is pointed out that Section 2-102 (Ark. Stat. Ann. § 85-2-102 [Add. 1961]) applies to *transactions* in goods, and that Section 2-202 (Ark. Stat. Ann. § 85-2-202 [Add. 1961]) omits all direct reference to *sales transactions*. The authors then state:

''* * * It should, therefore, apply to a lease of goods —a transaction in goods—by this simple construction of statutory language.''

It is thus clear that there is respectable authority for applying code provisions in some instances *where the transaction is analogous to a sale*. It is true that the authorities cited do not discuss the disclaimer provision in the code, nor do we find cases where this provision, as applicable to a lease, has been decided. However, in *Fairfield Lease Corp.* v. *Colonial Aluminum Sales, Inc.,* 3 UCC Rep 858 (NY Sup Ct., 1966), a case from the New York Supreme Court (not the court of last resort), a coffee vending machine had been leased by a vending company to the defendant. This lease had subsequently been transferred to a vending credit corporation, and suit was instituted against the defendant for a

balance of payments due under the lease agreement. After passing upon one point, the court then stated:

"The defendants also claim the lease, when considered in its entirety, is unconscionable (see, Uniform Commercial Code, § 2-302). This contention is based on the absence of any provision in the lease obligating the lessor to service and repair the machine, and the inclusion of a clause reciting that: 'Lessee agrees . . . .[the machine] is suitable for its purposes, and that Lessor has made no representation or warranty with respect to the suitability or durability of [the machine] for the purposes and uses of Lessee, or any other representation or warranty, express or implied with respect thereto.' In view of the denial of summary judgment, the court at this time need not decide whether the disclaimer of warranties is enforceable (Uniform Commercial Code, § 2-316) * * *."

So, at least, the question of whether the disclaimer provision is applicable, in appropriate circumstances, to a lease agreement, though not passed upon by the court, has been noted and urged as a point of reversal. We see no reason why, if appropriate lease transactions can properly be governed by the rules applying to sales, the disclaimer section should not also apply. If, in a sales transaction, one is required to exclude an implied warranty of fitness by a writing that is conspicuous, we see no reason why the same provision should not apply to leases that are analogous to a sale.

The comment by the New Jersey Supreme Court in the case of *Cintrone* v. *Hertz Truck Leasing, Etc.*, 212 A. 2d 769, somewhat expresses our thinking in the matter. This case was not decided under the Commercial Code, but under common law warranties,[3] although the code is referred to. The litigation related to the injury of Cintrone while a passenger in a truck which had been

---

[3] Under the common law, there was an implied warranty of fitness in leasing contracts of personal property.

leased by his employer from appellee. The complaint, *inter alia,* alleged a breach of appellee's warranty that the vehicle was fit and safe for use. The trial court dismissed this warranty claim by Cintrone, but on appeal, the Supreme Court reversed, holding that, on the facts proved, the contract for the leasing and use of the truck gave rise to an implied warranty that it was fit for the use contemplated by plaintiff's employer. It was further held that the evidence adduced created a jury question as to whether a breach of the warranty had been shown, and whether, if shown, it was the producing cause of the accident. It is true that this action was in tort, but we find it entirely logical to apply the same rationale to cases in contract. The court's discussion as to this feature is as follows:

"There is no good reason for restricting such warranties to sales. Warranties of fitness are regarded by law as an incident of a transaction because one party to the relationship is in a better position than the other to know and control the condition of the chattel transferred and to distribute the losses which may occur because of a dangerous condition the chattel possesses. These factors make it likely that the party acquiring possession of the article will assume it is in a safe condition for use and therefore refrain from taking precautionary measures himself. 2 Harper and James, Torts, § 28.19 (1956). Harper and James point out that the presence of such factors in sales set in motion the development of the doctrine of implied warranties. *They decry the notion, however, that because the doctrine had its origin in sales, the warranty protection should be withheld in other situations when the same considerations obtain. And they argue persuasively that in the face of present-day forms of business enterprise, development of the warranty doctrine in sales should point the way by suggestive analogy to similar results in cases where a commodity is leased.* [Our emphasis.]

"In this connection it may be observed also that

the comment to the warranty section of the Uniform Commercial Code speaks out against confining warranties to sales transactions.* * *''

The court continued, first quoting the article from Farnsworth (not included in our earlier quote):

" 'The expansion of enterprises engaged solely in bailment for hire seems to justify increasing imposition of absolute warranties, at least to the extent that they would be imposed upon a seller of similarly used goods. In addition, reliance is greater than in the typical sale, for it is generally true that the bailee for hire spends less time shopping for the article than he would in selecting like goods to be purchased, and since the item is not one he expects to own, he will usually be less competent in judging its quality.'

"A sale transfers ownership and possession of the article in exchange for the price; a bailment for hire transfers possession in exchange for the rental and contemplates eventual return of the article to the owner. By means of a bailment parties can often reach the same business ends that can be achieved by selling and buying.''

We are holding that Section 85-2-316 (2) is applicable to leases *where the provisions of the lease are analogous to a sale.* Here, the contract provides that the lessee shall pay all expenses of repairs and maintenance; further, Mr. Turner, the company treasurer, testified that it was probable that the machine would be offered for sale to appellant at the end of the sixty months' period. The transaction really seems to be a sale in every respect, except for the fact that the instrument provided that the ice machine should be returned to the lessor.

Let it be remembered that this subsection refers only to implied warranties; this holding has no effect

on any other provisions in the code—and, of course, to protect himself, the lessor need only, in his disclaimer, to use conspicuous language. He is thus fully protected. After all, what legitimate objection can be made to using type (for the disclaimer) that is conspicuous?

This is the first case of this nature to come before this court since the Uniform Commercial Code was enacted into law by the General Assembly, and, though not meaning to imply that subsequent remarks are directed to the case at bar, we think it well to point out that agreements of this nature will be examined closely by this court. It is possible that similar agreements could be used to cloak usurious charges, i. e., a transaction which was actually a sale could be set up as a lease in order to enable charges to be made that would, under a credit sale, constitute usury.

In accord with the reasoning set out in this opinion, we are of the view that the court therefore erred in directing a verdict for appellee. The judgment is reversed, and the cause remanded, with directions to proceed in a manner not inconsistent with this opinion.

FOGLEMAN and BYRD, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I respectfully dissent because the majority opinion extends the provisions of the Uniform Commercial Code to leases of personal property. I find nothing in the Commercial Code which remotely suggests that it has any such application. The definitions in the Chapter on Sales, from which the majority has applied certain sections, would definitely eliminate leases. See Ark. Stat. Ann. §§ 85-2-103, 85-2-106 (Add. 1961).

I agree with the majority that the transaction here involves a lease and I think that this conclusion is inescapable. Yet, I cannot justify using the Uniform Commercial Code as a vehicle merely to reach what would

seem to be a desirable result in this case. The majority, in making this application, cites comments and authorities as to the desirability of extending to leases the doctrine of implied warranty of quality, so long and well associated with sales transactions. I would find no great fault with this extension of the common law doctrine. Such an extension would not reach the result reached by the majority, however, because under the common law the disclaimer in this contract would exclude any implied warranty. It is only by resort to the code that the requirement that such an exclusion must be "conspicuous" can be applied. By doing this, I feel very strongly that the court is acting legislatively. I fear the problems that will arise in the future when the application of other sections of the Commercial Code to leases is sought. The draftsmen of the code did not have in mind that the provisions thereof would be extended to leases, and it may well be that the application of other sections will be somewhat clumsy. See, e. g., §§ 85-2-701 to 85-2-725, both inclusive.

I do not take the case of *Cintrone* v. *Hertz Truck Leasing and Rental Service,* 45 N. J. 434, 212 A. 2d 769, cited by the majority, to extend the Uniform Commercial Code to leases. It seems to me that the Supreme Court of New Jersey there extended the common law doctrine of implied warranty in sales to leases. Reference was there made to a comment by the draftsmen of the code. That reference to this comment (also quoted in the majority opinion) was made solely to demonstrate that the Uniform Commercial Code did not limit the court in applying case law doctrines of implied liability to transactions other than sales. It is interesting to note that the courts of New Jersey have refused to extend the doctrine in the *Cintrone* case in subsequent cases. *Magrine* v. *Krasnica,* 94 N. J. Super. 228, 227 A. 2d 539 (1967); *Jackson* v. *Muhlenberg Hospital,* 96 N. J. Super. 314, 232 A. 2d 879 (1967); *Conroy* v. 10 *Brewster Ave. Corp.,* 97 N. J. Super. 75, 234 A. 2d 415 (1967).

It is significant that when there is an intention that a lease be covered by any of the provisions of the Uniform Commercial Code, that intention is given expression. In Ark. Stat. Ann. § 85-9-102(2) (Add. 1961) it is specifically stated that the Article on Secured Transactions applies to security interests created by lease intended as security. I have not been able to find any other mention of leases in the code, nor have I found any definition of terms in the statute that would include leases other than the definition of "security interest" [§ 85-1-201(37)] and "security agreement" [§ 85-9-105(1)(h)]. These sections only make a lease subject to the code provisions on "Secured Transactions" when it is intended as security. This seems to be a very strong indication that no other code provisions were intended to apply to leases under any circumstances.

In *Victor* v. *Barzelski*, 19 Pa. Dist. & Co. R. 2d 698 (Pa. 1959), it was held that the "merchantability" warranty of Uniform Commercial Code § 2-314 (Ark. Stat. Ann. § 89-2-314) and the "fitness" warranty of UCC § 2315 (Ark. Stat. Ann. § 89-2-315) depend upon a "contract of sale" made by a "seller" for applicability. There an apartment owner sought to recover damages from one who contracted to install a heater in the apartment, alleging breaches of these warranties. The contractor purchased the unit from a supplier and installed it. The evidence showed that the owners made known to the contractor that they were relying on his skill and judgment to furnish a suitable heating unit. The court said that the agreement did not create the buyer-seller relationship necessary to bring it within these code provisions. The parallel between these cases is close. While the authority may not be one entitled to the greatest weight, the reasoning by which the conclusion was reached is certainly applicable.

The majority opinion implies that its effect is only to apply one isolated section of a chapter of the Uniform Commercial Code to leases rather than to sales.

This particular section (85-2-316) relates, however, only to warranties defined in §§ 85-2-313 and 85-2-314. These sections refer only to warranties by a "seller" to a "buyer." The meaning of these terms is that given in § 85-2-103(1) (a) & (d) unless the context otherwise requires. The warranties mentioned are also connected with contracts for sale. "Sale" and "contract for sale" are also clearly defined in § 85-2-106. None of these definitions remotely fit the situation before the court, principally because no passing of title from the seller to the buyer is contemplated here. The inapplicability of § 85-2-316 is further demonstrated by reason of the limitation of implied warranties to "contracts for * * * sale if the seller is a merchant with respect to goods of that kind." Appellee cannot be said, even by the wildest stretch of the imagination, to be a merchant with respect to ice machines.

It seems singular to me that this court, in holding this section applicable, would place reliance upon an argument with reference to this section made before, but not decided by, a trial court in New York.

The majority opinion attempts to confine its application of the code section to leases analogous to a sale. I cannot tell, and it is not suggested, when a lease of personal property is analogous to a sale. Is the length of the term significant? Are the courts to examine a lessor about his intentions with reference to the disposition of the property at the end of the term? Is the requirement that the lessee shall repair (not unusual in leases) to be the decisive factor?

I am unable to discern how we will be able to decide the application of code provisions to leases on a section by section basis in the absence of clear statutory intent. Nor do I see any guide to the trial bench or bar, much less to the business community, in making these decisions. The purpose of clarifying, stabilizing and making uniform the commercial laws of the various

states is thus defeated by creating an atmosphere of confusion about the whole thing.

I would affirm the judgment.

CONLEY BYRD, Justice, dissenting. I dissent from the majority opinion because I believe the lease under consideration was nothing more than a financial arrangement whereby appellee, Pioneer Leasing Corporation, was to loan money to Mr. Sawyer for the purchase of the ice-making machine. The record conclusively shows that such was the purpose of this arrangement. Mr. Don Barnett told Mr. Sawyer, "Well it was just like buying a car, after you pay so many payments it's your box." Mr. C. H. Turner, treasurer of Pioneer Leasing Corporation, stated that they purchased the machine from the C. M. Lingle Company because Mr. Sawyer had selected it as the machine he wanted.

Prior to the Uniform Commercial Code and our usury decisions, this transaction would have been handled by a conditional sales contract. Therefore, Pioneer stands in the same position as would the bank if Mr. Sawyer had borrowed the money from the bank—*i. e.,* it is entitled to collect the money it loaned. I would affirm the trial court without prejudice to the rights of the parties to sue the vendor of the machine for breach of warranty.

---

ᴬThe same is true of appellee's argument as to waiver; the fact that appellant made payments for approximately six months after learning of the malfunction, does not, of itself, operate as a waiver. The general rule, of course, is that a notice of a breach of any type of warranty must be given within a reasonable time after becoming aware of the breach. The determination of what is reasonable depends upon the factual situation presented in each individual case. See *Dailey* v. *Holiday Distributing Corporation* (Iowa), 151 N. W. 2d 477, where the plaintiffs continued to use purchased equipment' for eleven months after learning of defects, and endeavored during that period to remedy such defects.

ᴬThis paragraph was added by amendment May 27, 1968, after petition for rehearing. [See page 950.]