KLPR TV, INC., and Coronado Corporation, Plaintiffs,

v.

VISUAL ELECTRONICS CORPORATION and Noark Broadcasting, Inc., Defendants,

v.

L. M. (Jack) BEASLEY et al., Third-Party Defendants.

No. F–69–C–17.

United States District Court, W. D. Arkansas, Fayetteville Division.

May 25, 1971.

Sam Sexton, Jr., Fort Smith, Ark., for KLPR TV, Inc., Coronado Corp., and Jack Beasley & Omer Thompson.

Warner, Warner, Ragon & Smith, Ft. Smith, Ark., for Visual Electronics Corp.

Ball & Gallman, Fayetteville, Ark., for Noark Investments, Inc., and Noark Broadcasting, Inc.

## OPINION

JOHN E. MILLER, Senior District Judge.

On October 2, 1969, the plaintiffs, KLPR–TV, Inc., hereinafter referred to as KLPR, and Coronado Corporation, hereinafter referred to as Coronado, both Oklahoma corporations with their principal places of business in Oklahoma City, filed this action for declaratory judgment against Visual Electronics Corporation, hereinafter referred to as Visual, a New York corporation with its principal place of business in New York City, and Noark Broadcasting, Inc., hereinafter referred to as Noark, an Arkansas corporation doing business in Fayetteville, Ark., as TV Station KGTO.

Jurisdiction is based on diversity of citizenship and the amount in controversy.

In its complaint, the plaintiffs, KLPR and Coronado, alleged that the plaintiff KLPR was formerly in the television broadcasting business, and in June of 1967 executed a "Lease Purchase Agreement" with the defendant Visual involving certain broadcasting equipment for a sum in excess of $300,000; that the plaintiff Coronado endorsed and guaranteed the obligation of KLPR as a "courtesy"; that in 1968 KLPR assigned this contract to Noark with the consent of Visual, and that plaintiffs, KLPR and Coronado, have remained liable for the purchase price of said equipment as a condition of the assignment; that the equipment was delivered to Noark and services were performed by Visual for Noark in Arkansas.

That unknown to plaintiffs a dispute arose between Visual and Noark, and Noark by reason of said dispute is not making the payments on the "Lease Purchase Agreement"; that on September 17, 1969, Visual notified the plaintiffs of Noark's failure to make such payments, and demanded that plaintiffs make payment in full of the purchase price of said equipment; that Noark was ready, willing and able to make all payments

due but was withholding said payments for the failure of Visual to perform in accordance with its agreement; that Visual has threatened to file an action against plaintiffs for said purchase price and has demanded payment in the amount of $285,500.

The plaintiffs asked the court to determine:

(1) Whether or not Noark has made payments to Visual in accordance with the assignment of the lease.

(2) Whether Visual has waived its rights against plaintiffs for failure to give timely notice of Noark's failure to make such payments.

(3) The extent of the liabilities, if any, as between plaintiffs, Noark, and Visual.

(4) If plaintiffs are liable to Visual, then that plaintiffs should have judgment against Noark in that amount.

In the answer of Noark to the complaint, it alleged (1) that payments were withheld for failure to deliver the broadcast equipment on time, and (2) the equipment failed to operate properly.

In the defendant Visual's answer to the complaint, it alleged that it would not have assigned the lease without the plaintiffs' guarantee, and by way of cross complaint alleged that $262,041 was due pursuant to the lease agreement, the purchase agreement and the assignment, and the additional sum of $54,450 expended converting the equipment for Noark. Joint and several judgment was sought against the plaintiffs, KLPR and Coronado, and the defendant Noark in the amount of $316,445.92.

KLPR in its response to Visual's cross complaint alleged breach of warranty; that the equipment was not FCC approved or suitable; and alleged expenses of $55,000 in order to bring the equipment up to standard for Noark's acceptance of it.

Noark's response alleged breach of warranty, that the equipment was unfit even after modifications, and that Visual had received prompt notice from Noark.

It was further alleged that Noark was damaged by Visual's misrepresentation and breach of warranty in the amount of $235,000.

Later during the litigation, two third-parties to the action were brought in by the defendant Visual. They were L. M. (Jack) Beasley and Omer Thompson, who had guaranteed the performance of KLPR and Coronado on the agreements hereinbefore mentioned.

On April 6, 7 and 8, 1971, the case was tried to the court without a jury.

Because of the unusual procedures under which the questions before the court arose, defendant Visual presented its case first as an action for payments due upon the contract. The counterclaims of Noark, KLPR and Coronado were presented as defenses to the original action of Visual.

At the close of the evidence, upon motion of all parties, the court ordered that the pleadings should be considered as amended to conform to the evidence.

It appears conducive to a thorough understanding of the questions before the court to set forth at this point the general findings of fact to be supplemented by references to specific facts in the consideration and determination of the applicable law.

During the year 1965, Visual and KLPR began negotiations for the purchase of broadcast equipment from Visual. In July, Visual presented a "sales contract" for the signature of KLPR, but KLPR refused to execute that particular contract, and on August 31, 1965, executed a "lease agreement." KLPR did not go into operation of the television station under the lease agreement for several months because of the failure of Visual to promptly deliver and install the equipment. KLPR began making payments upon delivery of the equipment, but fell behind with its monthly payments, and a suit was brought by Visual against the guarantors, L. M. (Jack) Beasley and Omer Thompson, which was settled by agreement. As a

part of the settlement, the original instrument of August 31, 1965, was canceled, and on June 14, 1967, Visual and KLPR executed the lease agreement now before the court, (Visual Ex. 1). The total price to be paid by KLPR was $316,445.92, payable in 59 monthly installments, as follows:

June 15, 1967, through April 15, 1969 ......$2,660.00 per month
May 15, 1969, through April 15, 1970 ...... 3,989.00 per month
May 15, 1970, through April 15, 1971 ...... 5,320.00 per month
May 15, 1971, through April 15, 1972 ......11,963.16 per month

---

The agreement further provided that at the end of the lease period, the equipment could be purchased for $30,500. Pursuant to this lease agreement, Coronado executed a purchase agreement (Visual Ex. 2), under which it agreed to purchase the equipment leased to KLPR if KLPR defaulted on the lease contract. On the same date a personal guarantee of the performance of KLPR and Coronado was executed by L. M. (Jack) Beasley and Omer Thompson.

It was the intention of the operators of station KLPR to operate their TV station in Oklahoma City, Oklahoma, on a country and western format. They also desired to produce country and western programs on video tape for rebroadcasting by other TV stations in the area. KLPR was assured by Visual that the equipment was capable of performing satisfactorily in accordance with KLPR's proposed method of operation. The chief stockholder in KLPR, Jack Beasley, owns several radio stations in the south, but this was his first experience with television. Visual's sales representative, Len Hargrave, represented to Mr. Beasley that the equipment they were acquiring from Visual would be "the best." Hargrave, although still employed by Visual, did not testify. In the negotiations Noreleco Plumbicon cameras were specified. However, the cameras delivered were Visual Image Orthicon cameras. Other equipment as delivered appeared to be in less than satisfactory condition. The video tape recorder was represented as an older type unit which had been modernized through a process known as "Allenization."

Though Visual knew KLPR's planned usage for the video tape recorder, it was not capable of editing tape or producing a taped product which was compatible on any equipment used by the other local television stations. In an effort to obtain proper performance of the video tape recorder, an Ampex-Amtec was subsequently purchased from Visual.

The film chain unit delivered was equipped with a Bell and Howell projector which was not suitable for continuous commercial usage. It would not pass 80 percent of the film splices through the projector without malfunctioning.

The cameras which were delivered with the equipment operated properly for the first 200 hours. At this point they became a maintenance problem burning up two circuits consistently. The circuits malfunctioned so often that it was necessary to keep available two paper sacks with the proper transistors so that they would be immediately available to repair the equipment when it malfunctioned. In addition to this problem, the tube life was very short.

The transmitter as delivered was an experimental type transmitter which was conditionally allowed by the FCC on a waiver permit. The transmitter was a multiplex type unit which produced the audio and visual signal through one transmitter. There was a constant problem of maintenance with this transmitter, and the product produced on the home viewer's set was not satisfactory. In addition to these problems, several other pieces of equipment failed to function properly. The salesman of Visual knew that the equipment never would

broadcast a proper picture, representatives of Visual worked on the equipment at various times to attempt to correct its deficiencies, and three months after starting the operation KLPR closed down broadcasting facilities.

During this period of time a feasibility study was being made by a group of Fayetteville, Arkansas, businessmen to see if the Fayetteville area could support a TV station. In light of the information gathered in this survey, Noark was formed and an application was made for a permit to construct a station. Weldon Stamps, a man experienced in the operation of television stations, was also applying for such a permit, and they joined forces in order to construct a TV station. Stamps and Beasley were acquaintances, and negotiations were entered into by KLPR and Noark for assignment of the lease from Visual. These negotiations took place during the first part of 1968. On May 11, 1968, the negotiations broke down between KLPR and Noark. A letter (Noark Ex. 1) was sent to Mr. Beasley from Weldon Stamps stating that since the transmitter was not FCC type approved and could not be used in a television operation without considerable modification, the negotiations were terminated, and equipment for the Fayetteville station would be acquired from other sources. Shortly after this time, Jim Phillips, Treasurer of Visual, called on one of the major stockholders of Noark, Dr. Paul Milam, a retired Dean of Business Administration, University of Arkansas, and convinced Dr. Milam that Visual could and would work out an arrangement which would allow Noark to operate with the equipment held at that time by KLPR. Phillips assured Milam that they were receiving high-quality, up-to-date equipment which would be capable of producing a picture which would be competitive with the numerous programs of other stations which were received in the Fayetteville area through a cable television system there. As a result of the representations, an assignment was entered into on May 16, 1968, between KLPR and Noark whereby No-

ark received the equipment leased by KLPR from Visual. Noark began making monthly lease payments on the equipment on June 6, 1968. In addition to this equipment, KLPR also delivered certain broadcast equipment to Noark for the purpose of giving Noark added incentive to execute the assignment, (Visual Ex. 4). Mr. Beasley had informed Mr. Stamps of their problems with the equipment. It was understood at the time the assignment was executed by all the parties that Noark wanted its television station, KGTO, on the air in the early fall of 1968. There was at this time a campaign for the office of Governor taking place in Arkansas, and one of the candidates, Winthrop Rockefeller, the incumbent Governor, was expected to expend large sums of money for television advertising prior to the November general election. All the equipment in the possession of KLPR was delivered in September of 1968. Engineers and salesmen were hired by Noark for a proposed commencement date of October 15, 1968. However, the modification of the transmitter which was handled through Visual was not completed until the early part of 1969, and KGTO, Channel 36, did not go on the air until February 8, 1969. Noark made no lease payments after the month of April 1969. When KGTO did go on the air, the picture quality was poor and the sound, when present, was garbled and distorted. Although the equipment was worked on constantly, a proper picture was not produced during the first six months of operation. Advertisers who had originally subscribed to advertising with the station began to cancel their advertising contracts because of the poor broadcast quality. The advertising billed dropped 70 percent from the time the station went on the air until the end of the first 12 months of operation (Noark's Ex. 2). Noark has suffered a total loss of $247,-188 as of April 1, 1970. On April 1, 1970, since Noark could no longer broadcast, the FCC approved a transfer of the broadcast license from Noark to Noark Investments, Inc., an Arkansas corpora-

tion comprised of the same stockholders as Noark. Noark Investments was originally set up to hold the real property, building, antenna site, and such property as Noark would need to operate KGTO.

On July 20, 1970, Visual filed a petition pursuant to Chapter XI of the Bankruptcy Act, and the court entered an order authorizing the debtor (Visual) to continue to operate its business and manage its property pursuant to Section 343 of the Bankruptcy Act until further orders of the court. On August 12, 1970, the court also authorized Visual to continue with the prosecution of this action.

### Contentions of Visual

(1) "Warranties are not applicable in the lease of goods."

(2) "Warranties are not applicable in that the lessee used independent judgment and skill in making the selection of goods."

(3) "A recovery in favor of KLPR is waived in that KLPR accepted the goods."

(4) "There was no reasonable notice to Visual Electronics Corporation, thereby waiving any right to recovery."

(5) "The execution of the 1967 lease agreement constituted a novation and waiver of any breaches of warranty."

(6) "Noark Broadcasting, Inc., cannot assert any defenses waived or novated by KLPR–TV, Inc."

(7) "KLPR–TV, Inc., and Noark Broadcasting, Inc., have admitted that the equipment was functioning properly, thereby admitting no breaches."

(8) "Neither KLPR–TV, Inc., nor Noark Broadcasting, Inc., has sustained their burden of proof as to recoverable damages."

### Contentions of Noark and the Third-Party Defendant Noark Investments

(1) Under either the law of Arkansas or the law of New York the result would be the same in regard to the issues involved in this case.

(2) "If the transaction is classified as a sale, it carries warranties of merchantability and fitness."

"If the transaction be classified as a lease, it carried an implied warranty that the goods would be fit for the known intended use." "Either way Noark was the beneficiary of an express warranty."

(3) Noark notified Visual within a reasonable time upon discovery of the breach of warranty, and as the beneficiary of an express warranty Noark should not have to rely upon the rights of KLPR.

(4) Noark, having established a claim for breach of warranty, has a right to recover the difference in value of the goods at the time of acceptance and the value they would have had if they had been as represented, plus consequential damages and loss of profits.

### Contentions of KLPR and Coronado and the Third-Party Defendants L. M. (Jack) Beasley and Omer Thompson

(1) "A lease of equipment in absence of language to the contrary contains an implied warranty that the leased goods shall be fit for the intended purpose."

(2) "No waiver by KLPR–TV has been shown by the evidence."

(3) "Additional defenses asserted by Visual are not here applicable."

(4) These parties adopt the fourth contention of Noark as being the proper statement of the remedies available to Noark and KLPR.

In order to consider all of the parties' contentions in a logical fashion, the contentions will be considered according to subject matter, not in numerical order.

The instrument captioned "Lease Agreement" and dated June 14, 1967,

provides that it shall be governed and construed in accordance with the laws of the State of New York. All negotiations and transactions in which Noark was involved occurred in Arkansas. The only written document pertaining to this transaction executed by Noark, the assignment was executed by Noark in Arkansas and was to be performed in the State of Arkansas. Visual's negotiations and conferences with the representatives of Noark whereby Noark was induced to accept the equipment took place in the State of Arkansas. The laws of New York and Arkansas governing the transaction are strikingly similar in regard to the issues here involved, and the application of the law of either State compels the same result.

The defendant Visual on its brief states:

"The initial problem which must be overcome is that of whether or not there were warranties which applied to the equipment."

It admits that the Uniform Commercial Code provides for an implied warranty of merchantability. It argues that the transaction was a lease, not a sale, and since there was no sale of the equipment, there is no warranty.

The evidence clearly establishes that the equipment involved was not fit for the intended purpose of producing and transmitting a quality television picture. Visual seems to have admitted as much in its brief. It does not contend that the equipment produced a proper picture, but rather argues that there was no warranty that the equipment would function properly. If the transaction be classified as a sale, it carried warranties of merchantability and fitness.

Ark.Stat.Ann., § 85–2–314 (1961 Adden.), provides in part:

"(1) Unless excluded or modified (Section 2–316 [§ 85–2–316]), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * * *"

Section 85–2–315 provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

New York has enacted the Commercial Code containing the same provisions. If the transaction be classified as a lease, it carried an implied warranty that the goods would be fit for the known intended use.

General Talking Pictures v. Shea (1933), 187 Ark. 568, 61 S.W.2d 430, was a case in which the General Talking Pictures Corporation instituted a replevin suit against T. A. Shea to recover the possession of a talking motion picture machine which the latter had operated at McGehee, Arkansas, under a lease contract from the company. The lease was for a period of ten years under a license contract dated February 24, 1929, and provided for installment payments by the lessee. The contract provided that the lessor would service the equipment from time to time at the expense of Shea, and further that Shea should not obtain any additional, renewal or spare or assembled parts for the equipment otherwise than through the lessor. There were other provisions very similar to the provisions in the instrument now before the court. At page 575 of 187 Ark., page 433 of 61 S.W.2d it is stated:

"One of the points most strongly urged for the reversal of the judgment of the court below is that the court erred in instructing the jury that there was an implied warranty of the fitness of the machine for the use intended. This question must, of course, like all others relating to the construction of the contract, be decided according to the laws of the state of New York, as the parties had agreed that it should be."

The court, in quoting from the case of Hoisting Engine Sales Co. v. Hart, 237 N.Y. 30, 142 N.E. 342, stated at page 576 of 187 Ark., page 434 of 61 S.W.2d:

" 'A warranty of fitness is implied in leasing machinery for performance of specified work for which it was designed.' In the opinion in that case by the Court of Appeals of New York, Justice Crane, who delivered the opinion of the court, quoted with approval from Halsbury's Laws of England (volume 1, § 1117) the following statement of the law: ' "The owner of a chattel which he lets out for hire is under an obligation to ascertain that the chattel so let out by him is reasonably fit and suitable for the purpose for which it is expressly let out, or for which, from its character, he must be aware it is intended to be used; his delivery of it to the hirer amounts to an implied warranty that the chattel is, in fact, as fit and suitable for that purpose as reasonable care and skill can make it." ' "

At page 577 of 187 Ark., page 434 of 61 S.W.2d the court said:

"It must be remembered that the contract related to a machine about which Shea had no knowledge whatever, but for the use of which he was required to pay $2,000 before its installation was commenced, and that he was also required to incur expense preparatory to the installation of the machine, which, if it did not satisfactorily display talking moving pictures, was valueless. Under these circumstances we think it would not be a fair and reasonable construction of the contract to say that there was no implied warranty of the fitness and suitability of the machine for the purpose for which it had been leased, this being the only thing which gave it any value at all, when the contracting parties had not stipulated that there was no warranty, either express or implied."

In Sawyer v. Pioneer Leasing Corp. (1968), 244 Ark. 943, 428 S.W.2d 46, Chief Justice Harris, writing for the court, in an exhaustive and scholarly opinion discussed the applicability of the commercial code to an instrument that was designated as a lease. It held that the instrument, although designated as a lease, was analogous to a sale and the fact that a transaction is not technically a sale does not prevent extension of implied warranties where the transaction is analogous to a sale. In summary, the court beginning at page 957 of 244 Ark., page 54 of 428 S.W.2d, said:

"We are holding that Section 85-2-316(2) is applicable to leases where the provisions of the lease are analogous to a sale. Here, the contract provides that the lessee shall pay all expenses of repairs and maintenance; further, Mr. Turner, the company treasurer, testified that it was probable that the machine would be offered for sale to appellant at the end of the sixty months' period. The transaction really seems to be a sale in every respect, except for the fact that the instrument provided that the ice machine should be returned to the lessor.

"Let it be remembered that this subsection refers only to implied warranties; this holding has no effect on any other provisions in the code—and, of course, to protect himself, the lessor need only, in his disclaimer, to use conspicuous language. He is thus fully protected. After all, what legitimate objection can be made to using type (for the disclaimer) that is conspicuous?

"This is the first case of this nature to come before this court since the Uniform Commercial Code was enacted into law by the General Assembly, and, though not meaning to imply that subsequent remarks are directed to the case at bar, we think it well to point out that agreements of this nature will be examined closely by this court. It is possible that similar agreements could be used to cloak usurious charges, i. e., a transaction which was actually a sale could be set up as a lease in order to enable charges to be made that would, under a credit sale, constitute usury."

Examining the instant case in light of the controlling facts in Sawyer, we find the following: (1) The lessee and its assignee, KLPR and Noark, were responsible for all maintenance and repair. (2) The lessee had an enforceable option to purchase at the end of the term. (3) A conditional sales contract was first offered to KLPR by Visual. (4) Visual was in the business of selling such equipment, had large inventories of such equipment, and had a large amount of trade receivables from such sales in the past. At the very least, the transaction here was "analogous to a sale" within the meaning of the Sawyer case.

■ On the question of whether a warranty existed, the evidence is clear that Noark was the beneficiary of an express warranty that the equipment would be put in "first class" condition and would produce a quality television picture. As has been stated, the testimony is uncontradicted that Visual's agent represented that the equipment would be placed in "first class" condition and would be made to produce a quality picture. The statement was made before the assignment was executed. Noark relied upon the statement as Visual intended it to do. Noark was entitled to rely upon such statement, and it amounts to a warranty that the goods were fit for the intended use. See, Loe v. McHargue (1965), 239 Ark. 793, 394 S.W.2d 475; Southern Iron & Equipment Co. v. Smith (1914), 257 Mo. 226, 165 S.W. 804; Sawyer v. Pioneer Leasing Corp., supra.

■ Visual implied in its brief that parol evidence was not admissible for the purpose of showing an express warranty by Visual to Noark. The simple answer to this contention is that there is no written instrument integrating whatever agreement was reached between Visual and Noark. Visual here seeks to recover $54,450.00 from Noark based upon the oral agreement concerning alterations to be made to the equipment. It should not be permitted to seek recovery based on such oral agreement and at the same time defend the cross-complaint on the

grounds that oral evidence is inadmissible showing the warranty. Further, such testimony concerning the representations made by Visual's agent is admissible where there is no written instrument containing the entire agreement of the parties. Loe v. McHargue (1965), 239 Ark. 793, 394 S.W.2d 475.

KLPR contends that the contract is a lease and that it is a universal rule that a lease contains an implied warranty of fitness. In Ekco Products Co. v. United States (1963), 312 F.2d 768, 160 Ct.Cl. 75, the court in discussing the relationship between a bailor and a bailee, at page 771 said:

"Defendants owned and kept title to the Head Turning Machines during the entire period of production. Use and possession of the facilities, however, were given to plaintiff. The bailor-bailee relationship thus created was for the benefit of both parties. Defendant was able to induce plaintiff to accept the contract obligations and manufacture the cartridge cases; plaintiff expected to receive its profit upon successful completion of the contract. The law applicable to this situation is clear. Where there is a bailment for the mutual benefit of the parties, there is imposed on the bailor, in the absence of a special contract or representation, an obligation that the thing or property bailed for use shall be reasonably fit for the purposes, or capable of the use known or intended."

KLPR desired to go into the television broadcasting business. It was necessary that it obtain proper and efficient equipment, and Visual delivered the equipment to KLPR for that very purpose.

Visual alternatively contends that Ark.Stat.Ann., § 85–2–315 limits the implied warranty of fitness only to contracts where the lessee of the goods relied on the judgment and skill of the lessor, and contends that the lessee, KLPR, did not rely upon the judgment and skill of Visual in entering into the contract, and that KLPR, through Beasley, exercised independent judgment based on facts not related to any reliance

on lessor's skill or judgment. The evidence does not sustain the argument of Visual. Beasley was the owner of several radio stations at the time negotiations began for the purchase of the television equipment. Visual knew that this was his first endeavor in the television field. Even more convincing is the fact that Beasley was the beneficiary of an express warranty from a representative of Visual that the equipment which he would receive was first class and, as heretofore stated when negotiations were entered into with Noark, the Vice President of Visual repeatedly represented to Dr. Milam that the equipment would be of high quality and produce a good picture.

Visual argues that even if such warranties are found to exist, that KLPR has waived its right to rely on such warranties in that they accepted the goods; that they gave no reasonable notice of any breach of warranty; and that the 1967 lease agreement constituted a novation and waiver of any previous breaches of warranty. Ark. Stat.Ann., § 85–2–606 (1961 Adden.), reads in part as follows:

"(1) Acceptance of goods occurs when the buyer

"(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

"(b) fails to make an effective rejection (subsection (1) of Section 2–602 [§ 85–2–602]), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; * * "

Visual complains that KLPR is claiming a breach of warranty five years after the original lease was executed, and contends that a buyer is required to reject goods within a reasonable time, or his failure to make rejection will constitute acceptance. See, Hudspeth Motors, Inc., v. Wilkinson (1964), 238 Ark. 410, 382 S.W.2d 191; Ingle v. Marked Tree Equipment Co. (1968), 244 Ark. 1166, 428 S.W.2d 286.

Visual agrees that the sufficiency of notice of a breach of warranty depends on the facts and the surrounding circumstances, but contends that the record reveals no claim for breach of warranty of any type until the present litigation was instituted. Visual had continual notice of the unsuitability of the equipment by reason of constant complaints and problems encountered in dealings between KLPR and Visual from the date of the delivery of the equipment until the assignment to Noark. In the opinion of the court, the record is replete with facts and circumstances which constitute adequate notice to Visual of KLPR's dissatisfaction with the equipment. It is undisputed in the record that Visual had sent many persons to work on the equipment while it was in Oklahoma City at KLPR, and after it was moved to Fayetteville, Arkansas. KLPR and Noark made a good-faith effort to allow Visual time to get the "bugs" out of the equipment, but this did not constitute a waiver of any breach of warranty. It is obvious that Visual knew that the equipment was not performing properly and that KLPR was not satisfied. Visual additionally points out that by the terms of the lease agreement, it was admitted by KLPR that the equipment was in good operating order on June 14, 1967, the day of execution of the lease. The court would simply point out that Ark.Stat.Ann., § 85–2–316(2), (1961 Adden.), provides:

"(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' "

There was no exclusion of the implied warranty of fitness in the lease which

was executed by KLPR. Therefore, the contract clause which stated that the equipment was in good operating order at the time of delivery was not a waiver of any breach of warranty. It is only evidence of the faith that KLPR had in representations of Visual.

Noark argues that there was adequate notice given of breach of warranty to the defendant Visual in that they did not begin broadcasting until February 8, 1969, after having made payments on the lease prior to this date in the amount of $23,940.00, and that after only two months' further operation, they ceased making payments to Visual. During Noark's operation, constant complaints were made to Visual of the failure of the equipment to produce a good quality television picture, and upon the ceasing of payments, Visual was informed by Noark that no further payments would be made until the equipment was put into proper operating condition. At no time did Visual contend or complain that either KLPR or Noark did any act or failed to do anything that contributed to the failure of the equipment to perform as represented and warranted prior to the trial of this lawsuit. The court is convinced that Visual not only had reasonable notice but knew positively that the equipment was defective and would not produce a proper picture.

Visual further argues that both Noark and KLPR have admitted that the equipment was properly functioning in documents filed with the FCC. In view of the evidence before the court, it is apparent that FCC authority was necessary in order to broadcast and that in order to have FCC authority the equipment would have to be functioning properly under the criteria set out by the FCC. There was no evidence offered as to what criteria the FCC required to be met. Therefore, the fact that both KLPR and Noark submitted documents to the FCC stating that the equipment was operating properly cannot be considered controlling in view of the vast amount of evidence present to the court and the positive knowledge of Visual that

the equipment was incapable of producing a quality picture which was necessary for the TV stations to survive on the commercial market. There was no proof offered to the court by any of the expert witnesses who testified that there was any relation whatsoever between a good quality picture and the granting of FCC broadcast authority.

The single remaining problem for the court is that of damages. Visual argues that the "best evidence rule" would require the court to exclude all testimony about any lost advertising contracts of Noark because the contract itself would be the best evidence of the amount of loss. In addition to this, Visual asserts that the burden of proof is on Noark and KLPR to show that the written records of such contracts were not available. The testimony of Weldon Stamps is relied upon by Visual to show that such contracts did exist. The court is of the opinion that the loss incurred by Noark is amply established by uncontroverted evidence without any regard to specific advertising contracts which were canceled. The burden of proof as to damages for breach of warranty is upon those who assert the breach. According to Ark.Stat.Ann., § 85–2–714(2), (1961 Adden.):

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

Visual contends that Noark failed to meet the burden. It makes reference to the fact that Noark, in purchasing the assignment from KLPR, was fully informed by Mr. Beasley of all the problems which had arisen with the equipment, and that Noark failed to take reasonable precautions in purchasing the assignment and that such negligence defeats any claim for damages. Noark denies any negligence, and again calls the court's attention to the evidence establishing a breach of both warranties,

express and implied, by Visual. Ark. Stat.Ann., § 85–2–714, supra, and § 85–2–715.

Section 85–2–715 provides:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;"

The court is of the opinion that Noark was the beneficiary of an implied and an express warranty, and is entitled to recover such damages as the Uniform Commercial Code provides in the section hereinbefore set out.

Visual knew that a quality picture would be necessary for Noark to survive and that the equipment would be used in a TV station for the purpose of broadcasting. Noark argues that damages should be determined as follows: "(1) If the transaction be considered a lease, Noark cannot be required to make rental payments nor the expense in altering the equipment." Thus, Noark is entitled to a return of $29,260.00 rental payments, plus consequential damages proved in the amount of $247,000.00.

It is the opinion of the court that Noark has sustained the burden of proof as to its claim of breach of warranty and for losses in the amount of $150,000.00. The amount of loss in the sum of $150,000.00 is determined from a consideration of the evidence and the exhibits. The argument of Visual as to the best evidence rule does not affect this claim

nor is it passed on by the court. The equipment was leased; therefore the provisions of Ark.Stat.Ann., § 85–2–714(2), supra, pertaining to difference in value would not be applicable to this situation except as to the return of all lease payments.

Ark.Stat.Ann., § 85–2–715, provides for incidental damages which include "any other reasonable expense incident to the delay or other breach." The uncontroverted proof submitted to the court clearly showed that Noark had a planned broadcast date of October 15, 1968, but the transmitter was not delivered at that time, and the station did not go on the air until February 15, 1969. Also, there was testimony to the effect that 1968 was an election year and that a television station in this area could have expected a large number of political advertisements prior to the November election date.

Ark.Stat.Ann., § 85–2–715(2) provides for consequential damages which include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know * * *." Noark was organized and existed for the sole purpose of operating a television station. The loss which Noark has incurred was directly caused by the improper performance of the equipment which it leased from Visual. The loss arose out of the proximate consequence of the act of selling the substandard equipment to Noark. Visual was fully aware that Noark could not survive, especially in view of what had happened to KLPR in Oklahoma City, without quality equipment. In supplying the equipment involved in the transaction before the court, Visual represented that the equipment would be capable of performing in such a manner as to result in Noark's producing a good quality TV picture. The funds which were lost by Noark directly resulted from the production of a poor quality TV picture.

Noark's Exhibits 2, 3 and 4 are, respectively, a schedule of customer billings, financial statement and tax re-

turns for 1969, and a financial statement as of April 1, 1970. The advertising billing record shows a loss in billing from $12,600.00 in February of 1969 to $3,600.00 in April of 1970. The financial statement and tax returns reflect a loss of $157,205.00 during that year. The April 1970 financial statement reflects a total loss of $247,188.00. Visual was not the insurer of the financial status of Noark, and can only be held liable for those losses proximately caused by the lease of the defective equipment. There was no certainty that Noark could have a profitable business in Fayetteville or that it would not lose any money in the operation there. The amount of $150,-000.00 is a reasonable figure to adopt as the amount of loss suffered by Noark in relying upon representations of Visual and the breach of warranties. In addition to this sum, Noark is further entitled to recover all lease payments made to Visual under Ark.Stat.Ann., § 85–2–714. The equipment was not of any value at all to the operation of a television station. Visual's own expert witness, Robert Leach, testified that the equipment was generally junk, except for the transmitter which was a little better than junk at the time he saw it immediately prior to the trial. The engineers who testified for Noark and KLPR set out the deficiencies of this equipment, and clearly established it was of absolutely no value to the television station which was attempting to produce a quality picture. Noark is entitled to recover the amount of $29,260.00, the full amount of lease payments made to Visual, or a total of $179,260.00.

█ The court has heretofore referred to the prayer of the original complaint filed by KLPR and Coronado. In the cross-complaint of Visual, it prayed for judgment jointly and severally against plaintiffs, KLPR and Coronado, and Noark, as heretofore set forth. In the response to the counterclaim of Visual, KLPR and Coronado alleged that at the time the lease was assigned to Noark, Visual conceded and acknowledged that the equipment was not the type approved by the FCC and estimated that it would cost $55,000.00 to improve the equipment sufficiently for it to secure FCC approval; that plaintiffs actually delivered to Noark additional equipment of the value of $55,000.00 to offset such costs, and that plaintiffs have been damaged in the sum of $55,000.00 by reason of breach of warranty by Visual.

At the trial there was no testimony specifically directed to the value of the property delivered to Noark by KLPR at the request of Visual, and the court is unable to determine from the testimony the extent or the actual value of the property that was actually delivered. The court is convinced that KLPR did deliver some property to Noark, but it is also convinced that the delivery was made as a gesture to induce Noark to accept the assignment of the lease contract in the hope that KLPR, Coronado, and the guarantors would ultimately be released from any liability under the lease contract and under the guarantee. Thus, the court is convinced that the testimony is not sufficient to justify an award of damages to KLPR and Coronado.

Therefore, judgment is being entered today:

(1) Dismissing the cross-complaint of the defendant Visual Electronics Corporation against the plaintiffs, KLPR TV and Coronado Corporation, and the defendant Noark Broadcasting, Inc., with costs;

(2) Dismissing the third-party complaint by Visual Electronics Corporation against third-party defendants, L. M. (Jack) Beasley, Omer Thompson, and Noark Investments, Inc., with costs;

(3) Dismissing the claim of the plaintiffs, KLPR TV, Inc., and Coronado Corporation, for damages against Visual Electronics Corporation without costs; and

(4) That the defendant Noark Broadcasting, Inc., on its claim for damages have and recover from the defendant Visual Electronics Corporation the sum of $179,260.00, and costs.