491 So.2d 851 (1986)
J.L. TEEL COMPANY, INC.
v.
HOUSTON UNITED SALES, INC.
No. 54448.
Supreme Court of Mississippi.
July 23, 1986.
*852 Gary L. Geeslin, Columbus, for appellant.
Edward D. Lancaster, John P. Fox, Houston, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This lemon case is infested with several wormy issues. On one level it involves a copy machine that would not work. On another we are asked to decide to what extent, if at all, an equipment lease is a legal chameleon so that the Sales Article of the Uniform Commercial Code furnishes rules of decision for cases arising from such transactions.
For the reasons explained and to the extent articulated below we hold that, insofar as the lease is the functional equivalent of a sale, the provisions of the Sales Article furnish analogies from which we derive governing rules. Applying that principle to the case at bar, we hold, inter alia, (a) that the lessor warranted the copier to be fit for the lessee's particular purpose, (b) *853 that the lessor breached this warranty, (c) that the lessee nevertheless kept and used the copier for which the lessor is entitled to quantum meruit recovery, subject to two adjustments explained below. We affirm in part and reverse in part and remand.

II.
On May 15, 1979, J.L. Teel Company, Inc., ("Teel") as lessor, and Houston United Sales, Inc., ("Houston") as lessee, entered into a written equipment lease agreement the object of which was Teel's furnishing to Houston the exclusive use of a Minolta copying machine, Model No. 510. Houston agreed to pay a rental of $160.00 each month for a period of 36 months.
As a part of the contract Houston agreed to provide public liability insurance on the leased equipment, pay any applicable state and local taxes as additional rental and, at its own expense, maintain the leased equipment in good operating condition. The lease provided at its expiration that Houston had several renewal options plus the option to purchase the copier for five percent of the original gross lease price.
The contract contained the following provision: "THERE ARE NO IMPLIED WARRANTIES OF FITNESS FOR PURPOSE OR MERCHANTABILITY." Teel gave Houston an express warranty that the copier would be free of defects of material and workmanship under normal use and service. The express warranty provided that Teel would make all necessary adjustments to the copier not occasioned by accident, misuse, or negligence free of charge for a period of ninety days after installation and would then conduct a final inspection. Teel further obligated itself to repair or replace without charge any parts found to be defective within twelve months with certain listed exceptions. The express warranty did not apply to normal maintenance services, consumable items and equipment problems resulting from misuse, accident, negligence and lack of proper lubrication and maintenance, and provided, "This warranty is in lieu of all other warranties, express or implied."
The copier was installed on Houston's premises on May 15, 1979, and apparently provided acceptable service for a little over a month. On June 25, 1979, the first of eight documented service calls was made by Teel to the Houston premises. Each of these service calls, except the third (where Teel merely added toner to the machine), was occasioned by a malfunction of the copier.
The most significant of Teel's service calls was made on August 7, 1979, at which time Teel replaced the P.C. board in the copier. The P.C. board (the computer) is the brains of the copier; the copier will not operate without the P.C. board functioning properly. Teel replaced the thermostat, bushings, lamps, corona and receptacle on subsequent service calls.
Seven days after the August 7 service call, Houston wrote Teel and requested that the copier be picked up and Houston be released from the lease contract. There was testimony by Dwayne Griffin and Mrs. Janice Smith, president and office manager, respectively for Houston, that the copier was totally unsatisfactory. The record of service calls represented only the tip of the iceberg. According to Griffin Houston had trouble with the copier continually and after he wrote the letter on August 14, Griffin testified that the copier was never fixed.
Mrs. Smith testified in detail about trouble that Houston had with the copier: it jammed every two copies, the "wait" light would not go off, copies were blurred, it printed half pages, the reset button would not work, the copier smoked, and on occasions would not print. She further testified that she talked to Jim Teel, President of J.L. Teel Company, Inc., on November 19, 1979, reviewed the problems with the copier, and Teel said it was possible that the machine could have been a lemon and possibly it would be replaced.
Griffin made notes of calls to Teel complaining of problems with the copier on November 9, 12, 13, 15 and 19, 1979.
*854 Griffin said Jim Teel called on October 17, 1980, and said he would like to "make up and pick up the machine", but he wanted Houston to accept another copier on the same terms as with the Minolta. Griffin agreed to talk to his personnel and call Teel. He later called Teel and told Teel that it would be unfair to him to buy another copier from him because his, Griffin's (Houston's) personnel had lost confidence in Teel and his ability to furnish a copier that would be satisfactory.
Griffin never receded from the position taken in his August 14, 1979 letter that he wanted the copier picked up; however, when Teel finally sent for the copier, Griffin refused to surrender it because Teel would not sign a document releasing Houston from any further liability. Griffin also said Houston was not able to get any legible copies from the copier after he wrote the letter in August, 1979, and, if Houston had not kept its old copier, it would have been unable to make copies.
Testimony for Teel was to the effect that his company answered every service call and put the copier back in proper operation after each service call and also gave instructions by telephone to the employees of Houston about procedures to follow so the copier could be restored to service. Records taken from the counter of the copier showed that a large volume of copies had been made, suggesting that the machine must have functioned some of the time. This evidence, of course, suggests nothing about the quality of the copies made.
Houston finally gave up and ceased using the copier on April 10, 1980. The machine was placed in storage on Houston's premises. Houston continued to refuse surrender of the machine to Teel because Teel would not agree to release Houston from any further claims under the equipment lease agreement.
Not surprisingly, this history ultimately generated a veritable plethora of claims and counterclaims by and between Teel and Houston, all in the Circuit Court for the First Judicial District of Chickasaw County. In the above state of the evidence the Circuit Court, sitting without a jury, found that Teel had represented the copier as fit to do the job Houston needed, that Houston entered into the lease agreement in reliance upon these representations, and the copier "failed to do and perform the job" Houston required. Notwithstanding, the Circuit Court entered judgment for Teel against Houston for $1,227.76. This amount was composed of (1) monthly rentals from the date Houston stopped paying until the date Houston stopped using the machine and (2) $453.57 for supplies and service costs furnished by Teel.

III.
Teel filed a direct appeal assigning numerous errors which may be summarized as follows:
(1) The Circuit Court erred in holding that the Uniform Commercial Code's implied warranties applied where there was no sale of goods or passing of title.
(2) The Circuit Court erred in failing to enforce the terms of the lease which negated any common law implied warranty.
(3) The Circuit Court's finding of fact that the copier was not fit for its intended purpose was contrary to the overwhelming weight of the evidence.
(4) The Circuit Court erred in failing to allow Teel to recover attorney's fees and expenses pursuant to the terms of the lease of the contract.
Houston filed a cross-appeal and assigned the following as error:
(1) The Circuit Court erred in allowing a judgment against it.
(2) The Circuit Court erred in denying Houston recovery for incidental and consequential damages resulting from Teel's breach of warranties as provided by the common law and the Mississippi Uniform Commercial Code.
(3) The Circuit Court erred in assessing all court costs against Houston.

*855 IV.

A.
At its foundation this case presents the question whether, if at all, the provisions of the Sales Article of the Uniform Commercial Code, Miss. Code Ann. §§ 75-2-101, et seq. (Supp. 1985) furnish rules of decision we ought employ when resolving controversies arising out of equipment lease transactions.
Whenever practices and conditions change subsequent to the drafting and enactment of a statute, difficult questions of interpretation are presented. In the forty-odd years since the language of the Sales Article [Article 2] of the Uniform Commercial Code acquired its present form and the almost twenty years since that language was enacted into law in Mississippi,[1] substantial changes in commercial customs and usages have evolved. More specifically, business concerns today regularly acquire office equipment via varying types of leasing arrangements.
At the time Article 2 was drafted, office equipment was commonly acquired through purchase and sale. Various legal facilities were employed where the purchaser did not pay cash. A conditional sales contract, sometimes called a retail installment sales contract, would be used in two party transactions. Other forms of secured transaction  a chattel mortgage, a chattel deed trust  would be used when a lender or other finance company would be a third party to the arrangement. The advent of equipment leasing appears to have been brought on by tax and other economic considerations, by projections of obsolescence of office equipment and, generally, for reasons that would seem devoid of any intent to escape the impact of Article 2 of the UCC. Yet, though the form has changed, a great many of these leasing transactions are the functional equivalent of sales. Such cases challenge us to articulate rationally and clearly the theory upon which our law proceeds.
We recently decided Briscoe's Foodland, Inc. v. Capital Associates, Inc. (Miss.No. 55,033, dec. Feb. 19, 1986) (not yet reported) which held that Article 2 did not apply to a three party equipment lease wherein the lessor did not supply the goods but was in substance a financing agency. Briscoe's Foodland necessarily left open the question of whether in a two party equipment lease transaction, where the lessor occupies a position which is the functional equivalent of a seller, Article 2 should furnish our rules of decision.
This question has been presented to the courts of many of our sister states. A survey of the cases will reveal conflicting results.[2] One view with much to commend it is that, where the lessor supplies the equipment and the lessee acquires all of the substantive indicia of ownership, the provisions of the Sales Article [UCC Article 2] should by analogy furnish the governing law, but only to the extent that the lease is the functional equivalent of a sale and the provisions of Article 2 otherwise "fit". In other circles, the proposition has been advanced that Article 2 should apply in its entirety. This argument is premised upon the coverage section which provides that Article 2 "applies to transactions in goods; ... ." Miss. Code Ann. § 75-2-102 (1972). An equipment lease is certainly a "transaction in goods". On the other hand, the appropriate statutory sections contain much "sales" language. Candor requires the "by analogy" approach rather than an outright holding that Article 2 by its terms and in its entirety applies to lease transactions.
*856 One case frequently discussed and quoted from is Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House, 59 Misc.2d 226, 298 N.Y.S.2d 392 (1969), reversed on other grounds, 64 Misc.2d 910, 316 N.Y.S.2d 585 (1970). In Hertz the court explained why equipment leases should generally be governed by the rules of UCC Article 2.
Equipment leasing is a recent device whereby users of goods are enabled to have sole and exclusive use thereof for such periods of time as are economically beneficial to them at advantageous cost. It has become a widely used substitute for purchase, with .. . the lessee paying the equivalent of the full purchase price, plus interest, within the minimum lease period. The lessee, in effect, is the true purchaser. Under present tax laws, which appear to be the basis on which these arrangements are made, it is forseeable that this method of transferring the right to use goods will encompass a sizable portion of the volume of commercial transactions which have the use of goods (rather than their consumption) as their immediate economic end.
In view of the great volume of commercial transactions which are entered into by the device of a lease, rather than a sale, it would be anomalous if this large body of commercial transactions were subject to different rules of law than other commercial transactions which tend to the identical economic result.
298 N.Y.S.2d at 395.
Hertz relies in part upon Sawyer v. Pioneer Leasing Corporation, 244 Ark. 943, 428 S.W.2d 46 (1968), a case emanating from our neighboring state of Arkansas. Sawyer holds that, "where the transaction is analogous to a sale", Article 2  and specifically the warranty provisions of Sections 2-314, et seq.  are applicable. Sawyer notes persuasive analysis found in Farnsworth, Implied Warranties of Quality In Non-Sales Cases, 57 Colum.L.Rev. 653 (1957) wherein the author reasons that a bailment for hire
is very like a sale in regard to the reliance upon the supplier of the goods, and it is not surprising that a warranty of fitness for the intended use has been implied in a variety of such cases.
57 Colum.L.Rev. at 655, cited in Sawyer, 428 S.W.2d at 51.
We are concerned in the case at bar with the UCC warranty of fitness for a particular purpose. The rationale for imposing that warranty in transactions bearing the label "lease" was well put by the Supreme Court of Florida in W.E. Johnson Equipment Co., Inc. v. United Airlines, Inc., 238 So.2d 98 (Fla. 1970).
The reasons for imposing the warranty of fitness in sales cases are often present in lease transactions. Public policy demands that in this day of expanding rental and leasing enterprises the consumer who leases be given protection equivalent to the consumer who purchases. Although a sale transfers ownership and a lease or bailment merely transfers possession and anticipates future return of the chattel to the owner, there may be as much or more reliance on the competence or expertise of the lessor than on the competence or expertise of the seller. The prospective lessee with an immediate need is more apt to spend less time `shopping around' for the most suitable chattel if he contemplates possession for a relatively short time rather than permanent ownership. Just as in the sale of goods, the lessee may have little opportunity or ability to detect a design or other characteristic inherent in the leased chattel that might render it unsuitable for a particular intended use. The lessor as well as the seller is able to sustain or distribute as a cost of doing business the expense of protecting himself against damages sustained by breach of this warranty.
238 So.2d at 100.
Much of this language we cited in our recent Briscoe's Foodland decision.
Beyond the warranty sections, there are other provisions of Article 2 which have *857 been held applicable to leases by analogy. These include provisions on adequate assurance and anticipatory repudiation, William B. Tanner Co. v. WIOO, Inc., 528 F.2d 262, 270 (3d Cir.1975); UCC § 2-610, Tenavision, Inc. v. Neuman, 45 N.Y.2d 145, 148, 408 N.Y.S.2d 36, 379 N.E.2d 1166, 1168 (1978); the damages sections, KLPRTV, Inc. v. Visual Elecs. Corp., 327 F. Supp. 315, 326-28 (W.D.Ark. 1971), affirmed in part, 465 F.2d 1382 (8th Cir.1972); Addressograph-Multigraph Corp. v. Zink, 273 Md. 277, 284-88, 329 A.2d 28, 33-34 (1974); and the remedies sections, Sarafati v. M.A. Hittner & Sons, 35 A.D.2d 1004, 1005, 318 N.Y.S.2d 352, 354 (1970); Baker v. City of Seattle, 79 Wash.2d 198, 200-02, 484 P.2d 405, 407 (1971). See also Walter E. Heller & Company, Inc. v. Convalescent Home of First Church of Deliverance, 49 Ill. App.3d 213, 8 Ill.Dec. 823, 827, 365 N.E.2d 1285, 1289 (1977) and Xerox Corporation v. Hawkes, 124 N.H. 610, 475 A.2d 7 (1984).
The cases in this area were thoughtfully considered in Glenn Dick Equipment Co. v. Galey Construction, Inc., 97 Idaho 216, 222, 541 P.2d 1184, 1188-90 (1975). Adopting the "by analogy" approach, the Idaho court stated:
Reasoning by analogy does not require us to apply Article 2 in toto to a lease; rather, we need apply only those provisions which are sufficiently analogous. In order to determine which provisions are applicable, we will look to the commercial setting in which the problem arises and contrast the relevant common law with Article 2  we will use Article 2 as `a premise for reasoning only when the case involves the same considerations that gave rise to the Code provisions and an analogy is not rebutted by additional antithetical circumstances'.
541 P.2d at 1190.
To like effect is W.E. Johnson Equipment Co. v. United Airlines, Inc., 238 So.2d 98, 100 (Fla. 1970). This is the approach we this day adopt.

B.
Our decision to apply Article 2 by analogy is wholly in keeping with this Court's proper role as an interstitial lawmaker.[3] Were our law of sales still in the form of common law rules, we would not hesitate to extend them to situations functionally analogous to those which gave rise to and fell within the coverage of those rules. Such is the nature of the common law process. That the rules are now in statutory form compels no change in process. The only alteration is in the materials employed as the basis of deliberation and adjudication. Instead of precedent and case law analogies, the statutes are available.[4] The statutory rules, like the former common law rules, remain only points of departure, only analogies, although exceptionally informative and persuasive and illuminating analogies.[5]
That the rules of Article 2 are in statutory form places upon us an obligation that they be applied in analogous circumstances greater than were those rules mere common law rules. As legislative enactments they represent authoritative expressions of the public policy of the state. The legislature has prescribed the rules that govern certain types of private arrangements the labels for which  contracts of sale, etc.  are not outcome determinative but mere terms of convenience. We regard it our responsibility that Article 2 of the UCC, as enacted in this state, furnish the rules of decision in all cases functionally analogous to cases within the clear coverage of Article 2.
We would default in our duty if we succumbed to the tyranny of labels and held the rules of the Sales Article may have no *858 force in contracts not employing the magic labels  "sale", "buyer", "vendor", "purchaser" and the like. It would be an aberrant act of judicial legislation for us to "read" the statute as though it concluded with words such as "... and treat all other cases, no matter how analogous or how similar, quite differently".
Our duty in cases such as this is to ground our adjudications in the underlying circumstances and purposes of the statutory scheme and reason outward. Should our decision generate the legislature's displeasure, that body may step in and adopt some new provision. That the law emanating from the legislature may be superior in authority to that derived from the decisions of this Court seldom means we should stay our hand  only that we should be prepared on occasion to get it slapped.
In deciding whether UCC Article 2's provisions should by analogy be held to govern a particular equipment lease transaction, the fundamental inquiry, of course, is whether under the totality of the circumstances the lease is the functional equivalent of a sale. Considering for the moment only the two party transaction, there are a number of factors or questions the answers to which will bear upon whether such a conclusion is appropriate. Is the term of the lease roughly equivalent to the expected useful life of the equipment? Or, to put the question slightly differently in view of today's world, is the term of the lease roughly that amount of time at the end of which one may reasonably expect that the equipment though functional may have become obsolete?
Another question is whether the gross rentals for the terms are roughly what the time price would have been if the equipment had been purchased on an installment basis. Again, putting the point another way, are the gross rentals and monthly payments roughly what one would expect in a financed purchase having in mind prevailing interest rates?
Then there are such questions as, Who has the burden of insuring the equipment? Who pays taxes, if any, with respect to it? More basically, has the lessor furnished goods with respect to which the lessee has the exclusive use and control. The question in the end is whether the particular transaction is under the totality of the circumstances the functional equivalent of a sale. This being the ultimate question, no one should read into the foregoing any intent to provide that the subsidiary questions enumerated above are the only ones to be asked.
One question the answer to which will generally be of little assistance is, "Where is the title?" One purpose of the draftsmen of the Uniform Commercial Code was to eliminate resort to the concept of title in resolving controversies arising out of commercial transactions. While this effort was not totally successful, compare Miss. Code Ann. § 75-2-401 (1972) and § 75-9-202 (1972), the Official Comment to Miss. Code Ann. § 75-2-101 (1972) significantly states:
The arrangement of the present Article [the Sales Article] is in terms of contract for sale and the various steps of its performance. The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor. The purpose is to avoid making practical issues between practical men turn upon the location of an intangible something, the passing of which no man can prove by evidence and to substitute for such abstractions proof of words and actions of a tangible character. [Emphasis added]
Another question often thought relevant is whether the lease agreement contains a purchase option. To be sure, the presence of an option to purchase for a nominal sum (over and above aggregate rentals) makes the lease more analogous to a sale. The converse, however, does not necessarily follow. Neither the absence of a purchase option nor the presence of a purchase option for a substantial additional sum provides convincing evidence, in and of itself, that a given lease transaction is sufficiently *859 different from a sale so that Article 2 should be ignored.
The record before us is less than complete. Some of the relevant questions may not be answered. It nevertheless reflects that Teel supplied the copier, an item of office equipment detailed inspection of which was beyond Houston's immediate ken. Teel gave an express warranty to our knowledge similar to those customarily given in sales transactions. Houston had exclusive use and dominion of the copier, including the obligation to insure it and pay any taxes owing with respect to it. Finally, at the end of the three year lease term Houston had the option to purchase for a relatively nominal additional sum. In the face of these facts, only the label "lease" suggests that this transaction may not have been the functional equivalent of an installment sale.
In sum, the parties and their dealings in this case involve many of the same considerations that gave rise to the Sales Article. The apparent analogy to a sale is rebutted by no antithetical circumstances. By reference to the totality of the circumstances, we hold that Article 2 of the Mississippi UCC by analogy furnishes the rules of decision for this appeal.

V.
What rules then are we offered by the Sales Article of the UCC? We first turn to the implied warranty of fitness for a particular purpose. Miss. Code Ann. § 75-2-315 (Supp. 1985) by analogy suggests, in the context of the facts of this case, that Teel warranted that the copier was fit for the specific purposes communicated to it by Houston.[6] Beyond that, Miss. Code Ann. § 75-2-314 (Supp. 1985) by analogy suggests that Teel warranted the merchantability of the copier, i.e., that it was fit for the ordinary purpose of making multiple copies of other documents. When we import these implied warranties, we confront immediately the language of the contract which provides that there are no such implied warranties in this case. That effort at private law-making in turn is met by Miss. Code Ann. § 11-7-18 (Supp. 1985) which holds inoperative any such disclaimer of warranties. Sections 75-2-314 and -315, then, do apply by analogy.
For clarity, Section 11-7-18 creates no warranties. It saves warranties otherwise existing. Teel warranted (a) the fitness of the copier for the particular purposes Houston had communicated by virtue of the by analogy application of Section 75-2-315 and (b) its merchantability by analogy to Section 75-2-314.[7] Section 11-7-18 relieved Teel of the power to disclaim those warranties.[8]
The Circuit Court, sitting without a jury, found that Teel had breached its warranty of fitness for a particular purpose. Teel here challenges that finding, but when he does so, he runs headlong into established limitations upon our scope of review. A finding such as that made by the Circuit Court may not be disturbed on appeal if there be in the trial record substantial supporting evidence. It matters not that on the same proof others might have found the ultimate facts otherwise. See, e.g., Dungan v. Dick Moore, Inc., 463 So.2d 1094, 1100 (Miss. 1985); Culbreath v. Johnson, 427 So.2d 705, 707-08 (Miss. 1983). *860 The Circuit Court's finding that the copier was not fit for its intended purpose, and its attendant conclusion of law that Teel breached its warranty of fitness for a particular purpose, are affirmed.[9]

VI.
What remedies, then, are available to Houston for Teel's breach of the warranty of fitness for a particular purpose furnished to Houston with the copier?
By analogy to the provisions of Miss. Code Ann. § 75-2-606(1)(b) (1972), we consider that Houston accepted the copier, not necessarily on May 25, 1979, but when it failed to make an effective rejection after having had a reasonable opportunity to inspect the copier. On the other hand, by analogy to Miss. Code Ann. § 75-2-608 (1972), we consider that Houston's acceptance was reasonably induced by the difficulty of discovery of defects before acceptance and by Teel's assurances.
Houston then revoked its acceptance. The revocation was accomplished by Houston's letter of August 14, 1979. The Circuit Court found as a fact that the copier failed to do and perform the job required by Houston. Put in Article 2 language, the deficiencies in the copier were such that its value to Houston was substantially impaired. Miss. Code Ann. § 75-2-608(1) (1972). We further regard that the August 14, 1979 revocation occurred within a reasonable time after Houston discovered or should have discovered the grounds for it and before any substantial change in the condition of the copier not caused by its own defects.
Notwithstanding an effective revocation, Houston gains few benefits here because it kept and used the copier. Without doubt, failure to surrender the copier did not per se render ineffective Houston's revocation. Pavesi v. Ford Motor Co., 155 N.J. Super. 373, 377, 382 A.2d 954, 956 (1978), rev'd on other grounds, 88 N.J. 277, 440 A.2d 1345 (1982); Lawrence v. Modern Mobile Homes, Inc., 562 S.W.2d 729, 732, 24 UCCRS 874, 879-80 (Mo. App. 1978). The Circuit Court, however, gave no effect to the revocation and ordered Houston to pay for its continued use of the copier at the contract rate. This is too harsh, and Houston justly cross-appeals. We hold that Teel was not automatically entitled to recover the contract rate through April 10, 1980 (after which date the copier was of no use to anyone), but was entitled only to a quantum meruit recovery.
We begin with the UCC notion that a buyer who asserts a right to revoke acceptance has the same duties and obligations as a buyer who rejects goods before acceptance. Miss. Code Ann. § 75-2-608(3) (1972); See also Ramirez v. Autosport, 88 N.J. 177, 440 A.2d 1345, 1350-52 (1982). After rejection or revocation any exercise of dominion over goods may be considered wrongful as against the seller. Miss. Code Ann. § 75-2-602(2)(a) (1972); see also Miss. Code Ann. § 75-2-606(1)(c) (1972). This rule is designed to afford the seller the opportunity to recover possession of the non-conforming goods and unpaidfor use or dispose of them so as to minimize aggregate economic loss.
We find several cases from our sister states suggesting  without an explicit statutory basis  a seller's entitlement to the reasonable value of the buyer's use after revocation of acceptance. See, e.g., Lawrence v. Modern Mobile Homes, Inc., 562 S.W.2d 729, 732, 24 UCCRS 874, 879-80 (Mo. App. 1978); Mobile Home Sales Management, Inc. v. Brown, 115 Ariz. App. 11, 562 P.2d 1378, 1386, 21 UCCRS 1040, 1051 (1977); Jorgensen v. Pressnall, 274 Or. 285, 545 P.2d 1382, 1386, 18 UCCRS 1206, 1212 (1976); Stroh v. American Recreation & Mobile Home Corp. of Colo., 35 Colo. App. 196, 530 P.2d 989, 994, 16 UCCRS 726, 732 (1975); see also, White and Summers, Uniform Commercial Code § 8-3 (2d ed. 1980). Nothing in the statute, *861 however, precludes such an award for the buyer's use prior to revocation.
Finding nothing in Article 2 guiding us  by analogy  toward articulation of the measure of Teel's recovery for Houston's continued use of the copier, we turn to Miss. Code Ann. § 75-1-103 (1972), which provides:
Unless displaced by the particular provisions of this Code, the principles of law and equity, ... shall supplement its provisions.
See White v. Hancock Bank, 477 So.2d 265, 269 (Miss. 1985); Bay Springs Forest Products, Inc. v. Wade, 435 So.2d 690, 694 n. 1 (Miss. 1983); Franklin v. Lovitt Equipment Co., Inc., 420 So.2d 1370, 1372 (Miss. 1982); Thomas v. Prewitt, 355 So.2d 657, 661-62 (Miss. 1978). Among those non-statutory principles not displaced by the Uniform Commercial Code is the doctrine of quantum meruit. See Redd v. L & A Contracting Co., 246 Miss. 548, 554, 151 So.2d 205, 207 (1963); Pavesi v. Ford Motor Company, rev'd on other grounds, 440 A.2d 1345 (1982); 155 N.J. Super. 373, 379-80, 382 A.2d 954, 957 (1978); and Stroh v. American Recreation & Mobile Home Corp., 35 Colo. App. 196, 530 P.2d 989, 993-94, 16 UCCRS 726, 732 (1975). By analogy, that theory fits today's case.
Houston had the exclusive use of Teel's copier at least from May 15, 1979, until April 10, 1980  and Houston did in fact use the machine. While the record reflects that this use was anything but trouble free, it is equally clear that this use was of substantial value to Houston. Accepting the Circuit Court's implied finding that the copier was unusable after April 10, 1980, see Dungan v. Dick Moore, Inc., 463 So.2d 1094, 1100 (Miss. 1985), we hold that Teel is entitled to recover of and from Houston the reasonable value of the use of this particular copier between May 15, 1979 until April 10, 1980. In the present context, this will be the fair rental value of the copier during that period of time. This holding is predicated upon our view that under these facts the law entitles Teel to such a recovery on a quantum meruit theory.[10]
Added to the sum so determined should be the $453.57 for supplies and service costs furnished by Teel. Deducted, of course, should be the sum of all lease rental payments made by Houston to Teel. Given these premises, the matter of Teel's ultimate recovery, (if any), quantum meruit variety, thus augmented and diminished, should be relegated to the Circuit Court on remand.

VII.
Houston filed a counterclaim against Teel for $8,850.00 for damages; $3,750.00 of the amount was for storage fees for keeping the copier on the business premises of Houston.
The proof shows that Houston requested Teel to pick up the copier and release it from the contract. However, when Teel finally sent for the copier in the spring of 1981, Houston refused to let Teel have the copier until Teel signed a document releasing Houston from all obligation under the contract.
Houston was obligated to mitigate its damages. If it had surrendered the copier to Teel, it would have had no storage expenses. Our law will not reward obstinence by assessing Teel for Houston's unnecessary storing of the copier in Houston's office. There was no proof of any other damages. Therefore, we affirm the Circuit Court's denial of Houston's counterclaim.

VIII.
Houston also argues that the Circuit Court erred in assessing all costs against it. In view of the disposition we make of *862 this appeal, the cost provisions of the judgment below should be vacated, without prejudice, with costs to be taxed in the manner provided by law at the conclusion of all proceedings on remand.

IX.
Finally, there is the matter of attorneys fees. The equipment lease agreement provides that Teel may recover "all costs and legal expenses" incident to default by Houston.
The Circuit Court denied Teel's demand for attorneys fees. As the case must be remanded for further proceedings on the merits, so much of the final judgment below as denied Teel an award of attorneys fees should be vacated. On remand the Circuit Court may award to Teel, if it should be the prevailing party, such attorneys fees and legal expenses as may be reasonable under the circumstances, having in mind the efforts expended by counsel and the benefits conferred upon their client.

X.
In summary, on remand the Circuit Court is instructed to hold an evidentiary hearing wherein, in accordance with our discussion above of the quantum meruit theory, the issue will be the reasonable value to Houston United Sales of the copier from May 15, 1979, until April 10, 1980. To the sum so determined, there should be added $453.57, the amount Houston owes Teel for supplies and service charges. Then, there shall be deducted the sum of all payments made by Houston to Teel and fairly attributable to the equipment lease agreement.
Any positive sum so computed shall form the principal amount of a judgment in favor of Teel and against Houston, to which there should be added reasonable attorneys fees and legal expenses. Any negative sum shall be entered as a judgment in favor of Houston and against Teel, Houston made no demand for attorneys fees in the Circuit Court and has taken no cross-appeal from the Circuit Court's failure to award it such fees and expenses and, accordingly, is entitled to no such award should it prevail on remand.
All other issues tendered by the pleadings of either party shall be taken as having been finally adjudged by virtue of so much of the judgment below as was not appealed from and by this appeal, except that the matter of awarding attorneys fees and legal expenses and the assessment of costs shall await the completion of proceedings below on remand.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
PATTERSON, C.J., WALKER, P.J., ROY NOBLE LEE, P.J., and HAWKINS, DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] The Uniform Commercial Code was enacted in this state on May 31, 1966, and became effective March 31, 1968. Miss. Laws (1966) ch. 316. The language of the Sales Article had acquired its present form long before that.
[2] The cases are collected in Annotation, What Constitutes A Transaction, A Contract For Sale, Or A Sale Within The Scope of UCC Article 2, 4 A.L.R.4th 85 (1981) and 1985 pocket part thereto. A candid discussion of the overall question may be found in Boss, Panacea Or Nightmare? Leases In Article 2, 64 B.U.L.Rev. 39 (1984). See also, Bankoff, Implied Warranties of Quality Protection in Chattel Leases, 1969 U. of Ill. Law Forum 119 (1969).
[3] See Southern Pacific Company v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086, 1100 (1917) ("I recognize without hesitation that judges do and must legislate, but they can do so only interstitially", per Holmes, J., dissenting).
[4] See Landis, Statutes And The Sources Of Law, Harvard Legal Essays (1934) 213.
[5] See Gellhorn, Contracts And Public Policy, 35 Col.L.Rev. 679, 691 (1935).
[6] This case is factually distinguishable from Royal Lincoln-Mercury Sales v. Wallace, 415 So.2d 1024, 1027 (Miss. 1982), a case in which the buyer in no way communicated to seller any special or particular purpose.
[7] We have no pre-UCC cases concerning warranties in equipment lease transactions. Still, the conclusions stated above are hardly radical. As a matter of common law generally, in the absence of an agreement to the contrary, a bailor of a chattel, to be used for a particular purpose known to the bailor, impliedly warranted the reasonable suitability of the chattel for the bailee's known intended use of it. 8 Am.Jur.2d, Bailments § 157, p. 889 (1980); 8 C.J.S., Bailments § 25, p. 3580 (1962).
[8] Arguably, Teel's authority to disclaim these warranties is also limited by the Magnuson-Moss Warranty Act. 15 U.S.C. §§ 2301, et seq.; Henderson v. Benson-Hartman Motors, Inc., 33 D. & C.3d 6, 41 UCCRS 782, 790-95 (Pa.Ct.Com. Pl., 1983). That issue, however, is not before us, and we express no opinion on it.
[9] The facts found by the Circuit Court necessarily compel the conclusion that Teel similarly breached its warranty of merchantability. Today's result is the same, however, whether Teel breached both warranties  merchantability and fitness for purpose  or merely the latter.
[10] Economically, the impact of the approach we apply is the same as if we allow Houston to recover for breach of warranty, the difference between the contract price (aggregate of monthly rentals), and the value of what he in fact received (reasonable value of use between May 15, 1979 until April 10, 1980), compare Miss. Code Ann. § 75-2-714(2) (1972), with adjustments thereafter to reflect the sums actually paid by either party to the other.