594 So.2d 1153 (1992)
NORTH RIVER HOMES, INC.
v.
Elmer L. BOSARGE and Martha C. Bosarge.
No. 89-CA-0255.
Supreme Court of Mississippi.
February 12, 1992.
*1154 David R. Sparks, Sparks Wicker & Colburn, Tupelo, for appellant.
*1155 D. Neil Harris, Sr., Pascagoula, Brent M. Bickham, Bickham & Magee, Biloxi, for appellee.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
PRATHER, Justice, for the Court:

I. INTRODUCTION[1]
On August 20, 1983, Elmer and Martha Bosarge purchased from J & J Mobile Home Sales in Pascagoula a furnished mobile home manufactured by North River Homes, an Alabama corporation. The Bosarges were extremely proud of their new home  described by a J & J salesman as the "Cadillac of mobile homes." This "Cadillac," which cost the Bosarges a whopping $23,900,[2] turned out to be a jalopy. That is, upon moving into their new home, the Bosarges immediately discovered defect after defect after defect.

A. The Defects
The first defect which the Bosarges noticed was "the molding in the trailer popping loose." The second defect they noticed involved a bad water leak; "the water was running all over the trailer and ran into the insulation." This leak caused the trailer's underside to "balloon downward." Elmer Bosarge described other defects:
The [kitchen] counter ... was defective. The dishwasher door was warped in it. There was a big bow over the door, and this was after the setup. We didn't know this until after the trailer was on our property and setup that these defects showed up. We couldn't see them on the lot J & J because there was no light on in the trailer... . And there was a leak come under the trailer and it was a stench.
... .
... There was numerous things that I  oh, in the bathroom the  the little thing that goes around the sink, little edging, I guess you call it, fell off. A gentleman came out and repaired that. And it fell off a week later.
... .
[The bathroom door was] warped [and] couldn't [be] straighten[ed] ... . because the structure wasn't straight... . And the water would leak out when you would take a shower. This was in the shower... . And the shower door was warped. It wasn't sealed properly. The water would run out into the  into the bathroom floor.
... .
[The heating and cooling system in the trailer did not work properly. That is, t]he heating proposition was, it was cold. I mean it  it just got freezing cold. And my son came in there and said, Daddy, said, there's ice on my floor. I said, what did you do, spill water? He said, no sir. It's all around the base of the wall. And I went in there and looked and the [ice at the] base of the wall was at least an inch and a half thick around the base of that wall where the wind had come in through the trailer and sheeting on the windows. You could put your hand at the sockets and wind would come through the sockets [throughout the house].
... .
The trailer was not easy to cool. The air conditioner worked fine, but as far as keeping it cool, the ventilation in it, it took all the coolness out because if the cold can come in, the cold can come out... .
... .

*1156 The hot water backed up into the cold water. You would take and turn the cold water on and you would get hot water. Turn the hot water on [and] you would get hot water.
... .
[T]he sink from the stove to the wall longways to where the sink is, double sink that is, it bubbled up. I don't know what they call it, but the stuff on top of your sink, it had bubbles in it where it was just put together, just pieced together this way and water would run down in it. And then when you were washing dishes ... you are going to get water on it, and eventually that started popping up. It wasn't sealed properly. And that was from one end of it to the other... .
... .
[W]hen the wind would blow it would sound like a freight train running... . That top would just rumble. Instead, of being stationary it would, the roof would rumble.
... .
The doors were not fitted properly [with the stripping and you could] see[] daylight [when the doors were closed].
Rec. Vol. IV, at 107-13. Martha Bosarge's testimony picked up where Elmer's left off. She described walls which "buckled," cabinets with "chips and holes" in them, furniture "falling apart," a bedroom closet which leaked rainwater, and rooms which "stayed molded and mildewed."

B. The Repairs
The Bosarges immediately and repeatedly notified the manufacturer, North River Homes, of the defects. North River failed to repair the defects. In November 1983, the Bosarges informed North River of its decision to revoke their acceptance of the defective home. North River, however, assured the Bosarges that the defects would be repaired. The patient Bosarges relied  to their detriment  on North River's assurances. On numerous occasions, North River sent its repairmen to the Bosarges' home.[3] But on each occasion, the repairmen did not attempt to repair or failed to adequately repair or simply were unable to repair the defects.
For example, on several occasions, North River repairmen visited the Bosarges' home and failed to even attempt a repair of the cited defect. Elmer described one such occasion concerning a defective kitchen sink:
QUESTION: Was that problem ever discussed with North River?
ELMER: Yes.
QUESTION: And what was done about it?
ELMER: They sent a man out?
QUESTION: Who sent a man out?
ELMER: North River.
QUESTION: Okay.
ELMER: North River sent a man out. And he expected me to help him, but I had been sick. I had a heart attack  open surgery ... [a]nd I couldn't do any lifting... . And there was no way he could put that sink in himself.
QUESTION: Did he put it in?
ELMER: No.
QUESTION: Did he attempt to put it in?
ELMER: No.
QUESTION: Did he come back?
ELMER: No.
Id. at 110; see also id. at 108 (where Elmer testified that the repairmen who visited on another occasion did "nothing, not a thing" to repair the "air coming in around the [wall] sockets"); id. at 109 (where Elmer testified that repairmen visited but did not repair the hot-water problem); id. at 123 (where Elmer testified that "each and every time" repairmen would visit, they would tell him that they would be back to finish the repair work; but they never would return  not until the Bosarges telephoned North River to inquire of the repairmen's whereabouts).
On other occasions, repairmen's attempts to repair defects were made halfheartedly. For example, during one visit, a repairman visited the Bosarges in response to their complaint that the dishwasher door was *1157 warped. The repairman had taken with him a replacement door, but he did not install it. The repairman simply left the door with the Bosarges and told Elmer: (1) that he did not have time to install it, and (2) that he [Elmer] could install it himself. The repairman also left  without installing  a countertop to replace the defective one.
On some occasions, repairmen actually made attempts to repair various defects; however, their attempted repairs fizzled over a period of days. For example, repairmen "cut the under part of the trailer all up looking for" a water leak. "[W]hen they repaired the under part of the trailer they put it together with  this gray masking tape." Not surprisingly, the tape failed to hold the "under part" in place; that is, after a matter of days, the "under part" bowed out and required further repair (which never occurred). The leaking continued and a "stench" developed. The "stench" was caused by a buildup of mold and mildew as well as by a punctured septic tank line (a repairman had inadvertently driven a nail through the line and did not properly repair puncture).
Finally, on another occasion, the Bosarges complained that "edging ... that goes around the sink" had fallen off. "A gentleman come out and [ineptly] repaired [it a]nd it fell off a week later."
Elmer testified that each repairman with whom he had spoken advised him that his home was so defective that it "ought to be pulled off and another one put on."

C. The Ultimatum
The Bosarges finally decided to provide North River with an exhaustive "list of problems [that] ha[d] not been corrected on [their] trailer, as of June 4, 1984":
Kitchen:
Molding loose
Back window and door  door needs to be replaced  new framework for the door
Air comes in around the floor and thru the light sockets
Window pulling totally away from the seal
Refrigerator door squeeks when opened
Table will sit only in one spot, not level when moved
Stove not level
Parts missing in floor vents
Kitchen drawer broken
Counter top chipped  unfair top [sic]
Master Bedroom:
Paint peeling on the dresser
Braces for the mirror gone
Shower door not hung right
Enamel on both lids of the camode [sic] cracking  top does not fit properly
Wall boards behind vanity's loose  molding on vanity's not right
Caulking around tub pulling loose  Tub not bolted down
Air comes in thru the light sockets and around the floors
Breakers keep throwing
Faded spots on carpet in the bath
Molding around the window off
Small Bedroom:
Wall board has scratch
Door has gap at top
Closet door scrapes when opened or closed
Closet floor gets wet when it rains
Bathroom door warped
Enamel on camode [sic] cracking
Air comes in around the floor and thru the light sockets
Dew forms on walls and carpet in the cold months
Living Room:
Carpet pulling away from the wall
White spots on the carpet by the bar
Storm door has gap when closed  paint peeling on the door
Vents have parts missing
Air comes in thru the sockets and around the floors
Couch cushions are deformed
Outside of the trailer:
The trailer needs to be insulated
New bottom has to be put on  Servicemen cut big holes looking for a leak
Hot water tank needs to be replaced 
Hot water comes thru both faucets
Screws on outside rusting.
*1158 Plaintiff's Exh. 1. But North River "didn't do anything"; that is, North River seems to have thrown in the towel. Frustrated with North River's breach of its repeated assurances to repair the defects, the Bosarges wrote a letter to North River on October 4, 1984:
We are putting each of you on notice. The enclosed payments will be all we will send, until our home is replaced or repaired to our satisfaction.[4] We have contacted our attorney and fully intend to sue, for damages and total indebtness on our home. One year is long enough to wait for repairs to be made.
See Plaintiff's Exh. 2. The Bosarges did as promised; they withheld future payments on their loan.

D. The Response
The Bosarges' refusal to make future payments led Troy & Nichols, the lender/lienholder, to file a replevin action on April 11, 1985, in the Jackson County Circuit Court. This action was later dismissed for lack of prosecution.
On March 13, 1986, the Bosarges' attorney wrote North River:
Since the date of purchase of the mobile home it has been nothing more than trouble, it is of unmerchantable quality and is substantially impaired to Mr. and Mrs. Bosarge.
Mr. and Mrs. Bosarge at this time are revoking acceptance of their mobile home due to the substantially impaired value of the mobile home. Mr. and Mrs. Bosarge are tendering the mobile home back to you. It may be picked up by you at your earliest convenience upon notification to this office so that you may enter the premises so that you may pick up same.
Mr. and Mrs. Bosarge are revoking acceptance due to substantially impaired quality because of the breach of merchantability of the mobile home and the breach of warranty express and implied. I regret that the mobile home has been of such unmerchantable quality.
Mr. and Mrs. Bosarge are requesting their purchase price and incidental and consequential damages and attorney's fees. Please contact me and we will discuss these amounts.
Vol. I, at 81-82.
Subsequent to the repossession of their home, the Bosarges filed a complaint in the Jackson County Circuit Court against North River and Troy & Nichols.[5]

E. The Complaint and the Trial
In their complaint, the Bosarges alleged that the defendants breached various warranties  express, implied, and fitness:
[T]he Defendants either failed, refused or were unable to repair said mobile home and after further refusal and/or failure to repair the plaintiffs advised the Defendants they were revoking acceptance of the mobile home due to the fact that the mobile home was substantially impaired to them.
Vol. I, at 6. The Bosarges added that "they have revoked acceptance by allowing the mobile home to be repossessed by the defendants" and requested $25,000 in actual damages plus attorney's fees. See Anderson, Buyer's Damages for Breach in Regard to Accepted Goods, 57 MISS.L.J. 317 (1987).
Prior to trial, Troy & Nichols paid the Bosarges $1,000 in an out-of-court settlement. Thus, North River remained as the sole defendant when trial commenced on June 24, 1988. During the trial, North River twice moved for a directed verdict  each time to no avail. Upon conclusion of trial, the jury found for the Bosarges and awarded them $9,126.61. The trial judge also awarded $7,083.84 in attorney's fees. North River subsequently filed motions for j.n.o.v., remittitur, and new trial  all of which the judge denied.

*1159 F. The Issues

North River appealed and presented eight issues for this Court's disposition. For brevity's sake, these issues are consolidated accordingly:
1. Whether a Proper Revocation of Acceptance Occurred?
2. Whether the Mobile Home Was Substantially Impaired?
3. Whether North River Was Entitled to a Set-Off?

II. ANALYSIS
As noted, North River's issues derive, for the most part, from denials of various motions (directed verdict, j.n.o.v., new trial). This analysis, therefore, proceeds from an examination of the evidence in a light most favorable to the Bosarges  the nonmovants. For an elaboration of the applicable standards of review, see cases cited in footnote 1, supra.

A. Issue: Whether a Proper Revocation of Acceptance Occurred?

1. Parties' Contentions
North River contends that the statutorily-delineated "elements of a proper revocation of acceptance" are not evidenced in this case. Restated, "if, after rejection, there is an exercise of ownership by the buyer, ... buyer is considered to have accepted goods if he does any act inconsistent with seller's ownership."
The Bosarges counter that they "met their burden of proof of showing effective revocation of acceptance." The Bosarges contend that they produced at trial both testimonial and documentary evidence of a proper revocation. And the fact that they continued to occupy the mobile home for nineteen months after mailing to North River the October 4 notification letter (see Section I(C), supra) does not mean that they waived any right to revoke acceptance.

2. The Law
As discussed, the Bosarges' complaint was based on various theories of recovery. The judge instructed on the theories of breach of implied warranty of merchantability[6] and fitness[7]  as well as revocation of acceptance. Thus, the jury presumably concluded
from a preponderance of the evidence ... that [North River] breached its implied warranty of merchantability [and fitness] in connection with the mobile home [and that the Bosarges] afforded [North River] a reasonable opportunity to adjust or correct the defects in the mobile home ... prior to their [proper] revocation of acceptance.
See Vol. III, at 452, 454 & 458 (quoting jury instructions P-3A, P-9A & D-1).
When a consumer has accepted goods and subsequently discovers defects or a breach of implied merchantability, the consumer may invoke statutory and case law which conditions revocation of acceptance on:
(1) a nonconformity [or defect] which substantially impairs the value of the "lot or commercial unit";
(2) an acceptance[8]

*1160 (a) (with discovery of the defect) on the reasonable assumption that the nonconformity [or defect] would be cured or
(b) (without discovery) reasonably induced by the difficulty of the discovery or by the seller's assurances;
(3) revocation within a reasonable time after the nonconformity [or defect] was discovered or should have been discovered; and
(4) revocation before a substantial change occurs in the condition of the goods not caused by their own defects.
Beck Enterprises v. Hester, 512 So.2d 672, 676 (Miss. 1987) (citing MISS. CODE ANN. § 75-2-608 (1972); WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 8-3, at 303 (2d ed. 1980); Rester v. Morrow, 491 So.2d 204, 210 (Miss. 1986)); see also Gast v. Rogers-Dingus Chevrolet, 585 So.2d 725, 728 (Miss. 1991).
Once the consumer has properly notified[9] the seller of his or her intent to revoke acceptance, the seller has a right to attempt to cure the alleged defect. Guerdon Industries, Inc. v. Gentry, 531 So.2d 1202, 1207 (Miss. 1988); Rester, 491 So.2d at 210 (citing MISS. CODE ANN. § 75-2-508 (1972)); see also Fitzner Pontiac-Buick-Cadillac v. Smith, 523 So.2d 324, 328 (Miss. 1988) (holding that a car buyer's attempt to revoke acceptance without providing seller a reasonable opportunity to cure defects cannot succeed  i.e., "[s]uch opportunity for cure was a legal requisite of [buyer's] right to recovery"). This right is not unlimited; that is, Mississippi law does not permit a seller "to postpone revocation in perpetuity by fixing everything that goes wrong" with the good. "There comes a time when enough is enough"  when a consumer no longer must tolerate or endure a seller's repeated (though good faith) attempts to cure the defect. Gentry, 531 So.2d at 1208; Rester, 491 So.2d at 210. As aptly stated by a Florida Court of Appeals:
The buyer ... is not bound to permit the seller to tinker with the article, indefinitely in the hope it may ultimately be made to comply with the warranty. At some point in time, if major problems continue . .., it must become obvious to all people that a particular [article] simply cannot be repaired or parts replaced so that the same is made free of defect.
Orange Motors of Coral Gables v. Dade County Dairies, 258 So.2d 319, 321 (Fla. App. 1972) (citations omitted); see also Rester, 491 So.2d at 210 (citing several extra-jurisdictional cases). When the "time has come," the consumer may revoke once and for all. Rester, 491 So.2d at 210.

3. Application of Law
To recap, the Bosarges purchased their home in August 1983. After discovering numerous and serious defects, they notified North River; North River then assured them that the defects would be repaired. But the defects weren't repaired. The Bosarges consequently decided to inform North River in November 1983 that they "didn't want th[e] mobile home anymore." North River responded *1161 by reassuring them that the defects would be repaired. Repairmen repeatedly attempted, but failed, to repair the defects. So in June 1984, the Bosarges provided North River with an exhaustive written list of defects and demanded their repair. North River again assured the Bosarges that the defects would be repaired. And again, repairmen repeatedly attempted, but failed, to repair the defects. In October 1984, the Bosarges wrote a letter in which they notified North River of their consultation with an attorney, their frustration with a year's worth of repeatedly-breached assurances, and their decision to withhold future payments until the mobile home was repaired or replaced. North River's assurances, and the Bosarges' detrimental reliance, persisted  until the home was repossessed in May 1986.
North River contends that the Bosarges' failure to move out of their mobile home after "rejecting it" constituted an exercise of ownership (or dominion) and waiver of their right to revoke acceptance. North River's contention is unpersuasive. The Bosarges did not move out of their home in November 1983 and in October 1984  the dates when they notified North River of their intention to revoke acceptance  because they were repeatedly assured that the defects would be repaired. Their mistaken belief that North River would fulfill its assurances to repair the defects is but one reason why the Bosarges did not move out of their home. Another reason is simple and understandable:
When you tie up all your savings into purchasing a home, you cannot take it and park it somewhere[. Y]ou have got to live in it until you can get the people to clear your lot so you can put another one on it. It's just not like a car you can drive it on the lot and hand them the keys and say, it's yours.
Vol. IV, at 136 (testimony of Martha Bosarge).
North River's contention that the Bosarges should have moved out reflects ignorance of case law which requires a consumer, who expresses an intention to revoke acceptance, to provide a seller with a reasonable opportunity to attempt to cure the defect. Rester, 491 So.2d at 210 (citing MISS. CODE ANN. § 75-2-508 (1972)). The evidence unequivocally shows that the Bosarges complied with this law; indeed, one could arguably contend that they complied to an unnecessary extent. But the Bosarges' great patience is not surprising in view of their financial inability to move elsewhere.
The facts in this case are similar to another case which involved an automobile. Royal Lincoln-Mercury v. Wallace, 415 So.2d 1024 (Miss. 1982). In Wallace, Justice Patterson wrote:
[The facts] reveal[] an intention to revoke by Wallace [the consumer] when he stated to Fargason [the seller] that he was dissatisfied with the car and offered to trade for a new one. When this effort failed, Wallace advised Fargason that he would contact his lawyer. Fargason replied that he would meet Wallace in court. Although the issue is clouded by subsequent use of the automobile and additional efforts to have the defects corrected, Wallace's prior intention of revocation was revitalized when he parked the automobile within the 12 months and 12,000 mile warranty period and filed suit. Again, the issue was factual and was resolved by the jury on conflicting evidence against [the seller]. We think, therefore, that the [consumer] effectively revoked acceptance of that automobile.
415 So.2d at 1028-29. Unlike Wallace, the Bosarges could not "park" their home. As aptly noted by the Bosarges, "failure to surrender the [home] did not per se render ineffective [their] revocation." Appellee's Br. at 11 (quoting J.L. Teel Co. v. Houston United Sales, 491 So.2d 851, 860 (Miss. 1986) (J.L. Teel Co. involved revocation of acceptance of a photocopier)); accord Pavesi v. Ford Motor Co., 155 N.J. Super. 373, 382 A.2d 954, 956 (1978), rev'd on other grounds, 88 N.J. 277, 440 A.2d 1345 (1982); Lawrence v. Modern Mobile Homes, Inc., 562 S.W.2d 729, 732 (Mo. App. 1978). The record is simply devoid of any evidence of the Bosarges' intention to exercise wrongful ownership or dominion over the home once they declared that "enough is *1162 enough" and that their revocation of acceptance would be final.[12]
Any excessive or unreasonable use of the home by the Bosarges may be remedied through quantum meruit recovery  not through ineffectuation of revocation. J.L. Teel Co., 491 So.2d at 860-61 ("We find several cases from our sister states suggesting  without an explicit statutory basis  a seller's entitlement to the reasonable value of the [consumer's] use after revocation of acceptance.") (emphasis in original) (citing extra-jurisdictional cases and WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 8-3 (2d ed. 1980)).
The Bosarges alternatively contend that, because North River was not prejudiced, their "alleged delay" in vacating the home did not constitute a waiver of their revocation. According to the Bosarges, North River was not prejudiced because: (1) it "did not have the legal right to repossess the [home]," and (2) because Troy & Nichols (the lender/lienholder who settled prior to trial) "advanced the total cost of the [home], [North River] did not have the right to any of the sale proceeds." Research revealed no published opinion in which this Court has explicitly held that revocation cannot be waived where no prejudice is evidenced. However, this Court did cite with approval the case of Lawrence v. Modern Mobile Homes, in which the Missouri Court of Appeals held that the consumer "had not waived the right to revoke his acceptance by continued use of the mobile home" because the seller failed to prove resultant prejudice.[13] 562 S.W.2d at 730, cited in J.L. Teel Co., 491 So.2d at 860. The court of appeals added that a seller may, nonetheless, be entitled to "a set-off for the reasonable value of [a consumer's] continued use." Id. at 733. Whether proof of prejudice is necessary before revocation may be waived is an issue which need not be reached and, therefore, this Court declines to address it at this time.
In sum, the Bosarges' continued use of the home did not constitute a waiver of their right to revoke acceptance. At most, their continued use would mean that North River may have a right to a set-off, which is an issue addressed in Section II(C), infra.

B. Whether the Mobile Home Was Substantially Impaired?

1. Parties' Contentions
North River contends that the Bosarges "failed to prove that the mobile home in question was substantially impaired." The Bosarges counter that "the evidence clearly showed that the[ir] North River trailer was literally falling apart."

2. The Law
Mississippi law dictates that revocation of acceptance may succeed "only if there is substantial impairment of the value" of the good to the consumer. MISS. CODE ANN. § 75-2-608(1) (1972); see also J.L. Teel Co., Inc. v. Houston United Sales, Inc., 491 So.2d 851, 860 (Miss. 1986); Rester, 491 So.2d at 211; Volkswagen of America v. Novak, 418 So.2d 801, 804 (Miss. 1982). That is, substantial impairment "is determined by reference to the particular needs of the [consumer], even though the seller may have no advance knowledge of those needs and even though those needs may change after [an] acceptance." *1163 Rester, 491 So.2d at 211 (citing WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 8-3, at 308 (2d ed. 1980)).
The question of whether substantial impairment of the value to the consumer is evidenced is one for the factfinder to resolve. Gentry, 531 So.2d at 1208 (citing Bergenstock v. LeMay's G.M.C. Inc., 372 A.2d 69 (1977)). The factfinder's resolution of this issue should entail a subjective and objective review of the evidence. The subjective component of the factfinder's review involves consideration of the "unique circumstances" of the consumer. The objective component involves consideration of whether the defect would substantially impair the value of the good to a reasonable person whose unique circumstances are similar to the consumer's. Rester, 491 So.2d at 211 & n. 4 (citing numerous extra-jurisdictional cases); see also Gentry, 531 So.2d at 120. In short, "[e]very case must be carefully examined [by factfinder and appellate court alike] on its own merits to determine whether a nonconformity [or defect] is substantial." Bergenstock, 372 A.2d at 73 (emphasis omitted), quoted in Gentry, 531 So.2d at 1208.

3. Application of Law
Viewing the evidence in a light most favorable to the Bosarges (the non-movants), the jury's finding that a substantial impairment existed is supported by the evidence and should remain undisturbed. In Gentry, which involved revocation of acceptance of a mobile home, this Court affirmed the jury's finding of substantial impairment. 531 So.2d at 1210. The significance of this Court's affirmance in Gentry is that the home's defects were, comparatively speaking, far less serious than the defects evidenced in the case sub judice. Moreover, the Bosarges' testimony  which the jury was entitled to believe  revealed that each North River repairman who visited their home admitted to the Bosarges that their home was so defective that it "ought to be [replaced]." Notably, Ronnie Wilson, a HUD Mobile Home inspector, provided testimony which is also supportive of the jury's finding:
QUESTION: [M]y question is: would you live  okay? Heating, cooling, leaking roof, mildew, ice, would you live in that kind of home?
WILSON: No, sir, my wife wouldn't let me, sir.
Vol. V, at 182.
In sum, the record is replete with evidence to support the jury's finding that the Bosarges' home was substantially impaired. This Court therefore affirms on this issue.

C. Whether North River Was Entitled to a Set-Off?
In their complaint, the Bosarges requested $25,000 in actual damages.[14] The jury awarded damages in the amount of $9,126.61.[15] North River subsequently requested a set-off via its "MOTION FOR JUDGMENT NON OBSTANTE VEREDICTO, A REMITTITUR OR IN THE ALTERNATIVE A NEW TRIAL." In denying the request, the judge explained that the jury resolved the issue against North River and that he was "not inclined to disturb that verdict." North River included this issue on appeal and contends that the judge "fail[ed] to properly instruct the jury as to the element of damages allowing remittitur for the [Bosarges'] use" and that he "should have ... granted the remittitur" because this Court has held that a seller is entitled "to the reasonable value of the [consumer's] use after revocation of acceptance." North River's contention is a curious one. The record reveals that North River conceded during the post-trial hearing: *1164 "I think the jury was properly instructed." Vol. V, at 234. Forgetting for a moment North River's concession, the record reveals absolutely no objection to the instructions given by the judge; moreover, none of the instructions submitted by North River was refused. Thus, North River cannot now take issue with the sufficiency of the instructions. See Miss. R.Civ.P. 51(b)(3) ("No party may assign as error the granting or the denying of an instruction unless he objects ... before the instructions are presented to the jury ... ."); see also Roundtree v. State, 568 So.2d 1173, 1177 (Miss. 1990).
In sum, North River's failure to question the propriety of the instructions at the trial level constitutes a waiver of the right to raise the issue on appeal. This Court therefore affirms on this issue.

III. CONCLUSION
On the basis of the foregoing, the jury verdict shall remain undisturbed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] Because the appellant, North River, takes issue with the trial judge's denial of various motions (directed verdict, j.n.o.v., and new trial), the facts recited in Section I of this memo are based upon an examination of the record in a light most favorable to the appellees (or nonmovants), the Bosarges. For a more detailed discussion of the applicable standards of review, see generally Gast v. Rogers-Dingis Chevrolet, 585 So.2d 725, 728 (Miss. 1991); Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1177 (Miss. 1990); Guerdon Industries, Inc. v. Gentry, 531 So.2d 1202, 1205 (Miss. 1988); Rester v. Morrow, 491 So.2d 204, 211 (Miss. 1986); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
[2] Troy & Nichols, Inc. financed the purchase of the mobile home.
[3] Elmer testified that repairmen visited his home at least five times. These visits are documented in the record. See, e.g., Vol. I, at 83-88.
[4] At the time when they refused to make future payments, the Bosarges had made thirteen monthly payments of $340.45 each.
[5] The Bosarges did not sue the seller, J & J Mobile Homes. The record indicates that J & J had become insolvent and had closed down its business.
[6] Statutory law on implied warranty of merchantability provides in part:

(1) A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....
(2) Goods to be merchantable must be at least ...
(c) ... fit for the ordinary purposes for which such goods are used... .
MISS. CODE ANN. § 75-2-314 (1990 Supp.). An implied warranty of merchantability may not be waived or disclaimed. Gast v. Rogers-Dingus Chevrolet, 585 So.2d 725, 728 (Miss. 1991) (citing MISS. CODE ANN. §§ 11-7-18 & 75-2-719(4) (1990 Supp.)).
[7] Statutory law on implied warranty of fitness provides in part:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skills and judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose... .
MISS. CODE ANN. § 75-2-315 (1990 Supp.).
[8] Pursuant to statutory law:

(1) Acceptance of goods occurs when the buyer
(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
(b) fails to make an effective rejection (subsection (1) of Section 2-602) [§ 75-2-602(1)], but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.
(2) Acceptance of a part of any commercial unit is acceptance of the entire unit.
MISS. CODE ANN. § 75-2-606 (1972).
No one disputes that the Bosarges had "accepted" the mobile home. See Gentry, 531 So.2d at 1206 (citing statutory and case law).
[9] See MISS. CODE ANN. § 75-2-608 (1972) for proper forms of notice of revocation. The consumer's failure to provide the seller with notice of his intention to revoke acceptance of an automobile led this Court to affirm in favor of the seller in the recent case of Gast, 585 So.2d at 729. The consumer had notified the lender/lienholder  but not the seller. The consumer erroneously believed that his notification of the lender would be imputed to the seller in view of the lender's "close working relationship and contractual ties" with the seller. Id. at 728.

The specific "notice issue" involved in Gast is not involved in the case sub judice.
[12] North River additionally contends that the Bosarges' wrongful exercise of control (or dominion) is reflected in their "resistance" in "a replevin action [which] was filed to recover the home." Appellant's Br. at 2-3. Close scrutiny of the record, however, reveals not a scintilla of evidence to support North River's contention that the Bosarges "resisted the replevin." See Defendant's Exh. 1 (documents relating to the replevin action contain no evidence of "resistance"). Indeed, North River's contention totally ignores the contents of a letter written by the Bosarges' attorney after the replevin action was filed. In this letter, the attorney informs North River that "Mr. and Mrs. Bosarge are tendering the mobile home back to you [and i]t may be picked up by you at your earliest convenience." At most, the Bosarges simply sought the advice of their attorney upon being served with the summons in the replevin action. The home was eventually repossessed.
[13] The Missouri court additionally noted that, under pre-U.C.C. case law, continued use did constitute a waiver of the right to revoke acceptance. Lawrence, 562 S.W.2d at 731 (citing cases).
[14] For an extensive discussion regarding the appropriate measure of damages in cases like the one sub judice, see generally Gast, 585 So.2d at 728-30.
[15] The trial judge also awarded attorney's fees in the amount of $7,083.84. Vol. III, at 464. Section 2310(d)(2) of the Magnuson-Moss Warranty Act provides a judge with the discretionary power to award attorney's fees. See also Gentry, 531 So.2d at 1209 (discussing the Act in detail).

The award of attorney's fees is not an issue in this appeal.